Louis COFONE

v.

John R. MANSON, Commissioner,
Department of Correction, et al.

Civ. No. H–74–367.

United States District Court,
D. Connecticut.

March 17, 1976.

Martha Stone, West Hartford, Conn., for plaintiff.

Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn., for defendants.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This civil rights action, brought by an inmate at the Connecticut Correctional Institution at Somers, Connecticut, challenges the procedures adopted by the Department of Correction for screening incoming mail.

The action is brought pursuant to 42 U.S.C. § 1983 (1970), and jurisdiction exists pursuant to 28 U.S.C. § 1343(3) (1970). The defendants, sued in both their individual and official capacities, are John Manson, the Commissioner of Correction for the State of Connecticut; Carl Robinson, the Warden at Somers; and James Singer, an Assistant Warden, also at Somers.

The plaintiff challenges four different practices of the Department of Correction. His first and broadest attack is a constitutional challenge to the procedure for screening incoming literature, includ-

ing the present procedure for appealing from decisions which refuse entrance to certain publications.[1] His second challenge concerns the right of the prison to open privileged communications between attorneys and their inmate clients.[2] Third, he attacks the constitutionality of regulations which authorize the warden to single out an individual prisoner for a complete "screen" of all his incoming mail. Finally, he alleges that on several occasions his mail was delayed or opened out of his presence, in violation of the prison's own regulations which require that privileged mail be opened in the presence of the inmate.

Although the plaintiff originally sought injunctive as well as declaratory relief, his complaint was subsequently amended to remove all claims for injunctive relief and thereby avoid the necessity of convoking a three-judge court. See Steffel v. Thompson, 415 U.S. 452, 457 n. 7, 94 S.Ct. 1209, 1214, 39 L.Ed.2d 505, 513 (1974).

### I. Exhaustion

The defendants' first claim is that this complaint should be dismissed because the plaintiff has failed to exhaust his administrative remedies.

In Steffel v. Thompson, 415 U.S. 452, 472–73, 94 S.Ct. 1209, 1222, 39 L.Ed.2d 505, 522 (1974), the Supreme Court stated:

"When federal claims are premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)—as they are here—we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights."

---

1. This issue was before this court once before, but in a more limited scope. In Paka v. Manson, 387 F.Supp. 111 (D.Conn.1974), I ruled that although prison officials could prohibit the formation of a prisoners' union, they could not bar a publication entitled The Outlaw simply because it promoted the cause of unionism. Paka did not, however, involve a broad constitutional attack on the Department's mail regulations.

2. This issue has previously been considered by this court as well in Jones v. Manson, Civil No. 15,441 (D.Conn.April 13, 1973). The plaintiff in this action was likewise the plaintiff in a companion case included in that opinion, Cofone v. Manson, Civil No. 15,613 (D.Conn.April 13, 1973). The defendants have not, however, attempted to raise an estoppel argument.

This statement was repeated in *Ellis v. Dyson*, 421 U.S. 426, 432–33, 95 S.Ct. 1691, 1695, 44 L.Ed.2d 274, 281 (1975).

The Court of Appeals for this circuit, although conceding on the issue of judicial exhaustion, has interpreted the statements regarding administrative remedies in both *Steffel* and *Ellis* as *dicta,* and has refused to alter the exhaustion requirement in the absence of a more direct statement by the Supreme Court.[3] *Fuentes v. Roher*, 519 F.2d 379, 386 (2d Cir. 1975); *Plano v. Baker*, 504 F.2d 595, 597 (2d Cir. 1974).

The court's most recent discussion of this issue, occurring in the context of a similar literature case, *Morgan v. LaVallee*, 526 F.2d 221 (2d Cir. 1975), disputes the proposition that the *Steffel* statement was *dictum.* However, this discussion is itself *dictum*, since, rather than abandoning the exhaustion requirement, the panel found that on the facts before it the prisoner's administrative remedies had been exhausted. The holding of that case, however, serves as the basis of decision for the exhaustion argument here. There the court held that:

"Before the court below may relinquish its § 1983 jurisdiction it must, on the most narrow reading of the cases, be positively assured—it may not presume—that there are speedy, sufficient and readily available administrative remedies remaining open to pur-

sue, an assurance certainly not attainable on this record." 526 F.2d at 224.

■ A description of Mr. Cofone's attempts to seek relief within the prison system leaves no room for arguing that such an administrative remedy was either speedy or readily available. After learning that the publications in question had been rejected, Mr. Cofone attempted to appeal to the Central Office Library Committee on several occasions. In one attempt, he wrote directly to the Committee in Hartford. After a delay of almost a month, he received a letter from the Commissioner telling him that he should have written in care of the Commissioner or his assistant and suggesting that he begin again at the institution level.[4]

■ The final position of the defendant has been that the plaintiff has the duty to provide the Library Committee with a selection of three or four recent issues before a specific publication can be approved.[5] Since I hold that requirement is in itself an unconstitutional burden, and since the facts as presented at the hearing in this matter demonstrate that the Department of Correction has not presented the plaintiff with a "speedy, sufficient and readily available administrative remedy," I find that the plaintiff's efforts to appeal the exclusions have relieved him of any further duty to exhaust the remedies available within the correctional system, if, in fact, such a duty does exist.[6]

3. That statement is expected in *McCray v. Burrell*, 516 F.2d 357 (4th Cir. 1975), *cert. granted*, 423 U.S. 923, 96 S.Ct. 264, 46 L.Ed.2d 249, 44 U.S.L.W. 3257 (1975).

4. Letter from John R. Manson, Commissioner of Correction, to Louis Cofone, Sept. 11, 1974, Defendants' Exhibit 5. The defendants' reliance on *Carrona v. Manson*, Civil No. H–75–2 (D.Conn.June 16, 1975) is misplaced. In that case the plaintiff, upon receiving notice of the rejection of his publication, immediately filed suit in federal court. In the present case, Mr. Cofone made an extensive effort to exhaust the administrative remedies available to him.

5. The specific request to the plaintiff was for five or six issues. Memorandum from John R. Manson to All Wardens, September 16, 1974,

Exhibit A to Defendants' Answer. In the most recent regulations however, the number has been reduced to three or four. Department of Correction, Administrative Directive, *Review of Reading Materials*, ch. 3.7, § 2(b)(5) (July 1, 1975).

6. The defendants also pointed out at the hearing, and again in their brief, that many of the periodicals which Cofone desires to receive have been admitted since he last attempted to avail himself of his administrative remedies. Furthermore, they argue that he has had no literature rejected upon administrative review since the new directive was issued in July 1975. Therefore they conclude that Cofone should once again raise his arguments at the prison level.

## II. Censorship of Incoming Publications

All publications mailed to inmates in the Connecticut correctional system are, upon their arrival at the prison, screened by the librarian.[7] If he finds there to be a serious possibility that the publication might meet one of the "Criteria for Rejection"[8] promulgated by the Commissioner, he refers the offending publication to a body euphemistically called the prison "Library Committee."[9] If the committee decides to reject the publication, the inmate-addressee is notified of the decision, the reason, and his avenue of appeal.[10] If the inmate chooses to appeal the decision he can obtain another review by supplying the committee with three to four issues of the periodical.[11] If the Library Committee again decides against him, he can appeal that decision to the Central Office Library Review Committee, with overall responsibility for the Connecticut prison system, whose decision is final.[12] Once a publication has been approved, a higher burden is placed on the individual institutions if they desire to reject a specific issue.[13]

An assessment of the validity of the plaintiff's challenges to both the rejection criteria and the appeals process must begin with *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). In that decision the Supreme Court, after examining a series of earlier lower court decisions held that

" . . . censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad."

416 U.S. at 413–14, 94 S.Ct. at 1811, 40 L.Ed.2d at 240.

But *Procunier* does not explicitly govern the decision of this suit for two reasons. First, *Procunier* was based on the first amendment rights of the prisoners'

---

While it is far from clear which publications are currently being admitted to the prison, the defendants admit that not all the publications which the plaintiff has requested are being admitted into the institution. Since the plaintiff's challenge focuses on the constitutionality of the review procedure, rather than its application to any particular publication, there exists a sufficient present controversy for the purposes of the Declaratory Judgment Act and article III. *Ellis v. Dyson,* 421 U.S. 426, 434–35, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274, 282 (1975). *Cf. United Auto Brokers v. Pac,* Civil No. H–75–195 (D.Conn.Dec. 18, 1975).

7. Department of Correction, Administrative Directive, *Review of Reading Materials,* ch. 3.7, § 2(a)(4).

8. *Id.,* § 4. This section reads:
 "CRITERIA FOR REJECTION OF PUBLICATIONS.
 a. Publications may be rejected if they:
 (1) concern plans and techniques of escape;

(2) give instructions for the making of drugs or poisons;
(3) advocate disruption within institutions or in the community;
(4) have demonstrably cause disruption within institutions or in the community;
(5) advocate racial, religious or nationality hatred;
(6) provide information regarding criminal skills (lock-picking, safe-cracking, etc.);
(7) give instructions for the construction of weapons, explosives, or incendiary devices;
(8) give instructions in combative skills;
(9) obstruct rehabilitative objectives; or
(10) would be unacceptable under U.S. Postal Regulations."

9. *Id.,* § 2(b)(2).

10. *Id.,* § 2(b)(3–4).

11. *Id.,* § 2(b)(5).

12. *Id.,* § 2(c).

13. *Id.,* § 3.

correspondents; the question of the prisoners' rights was specifically reserved. 416 U.S. 408, 94 S.Ct. 1808–09, 40 L.Ed.2d 237. Second, *Procunier* dealt with individual letters addressed to prisoners; the question of mass mailings was also explicitly left open. 416 U.S. 408 n. 11, 94 S.Ct. 1809, 40 L.Ed.2d 237.

The existence of prisoners' first amendment rights, which had been recognized earlier in this circuit, *Goodwin v. Oswald*, 462 F.2d 1237 (2d Cir. 1972); *Fortune Society v. McGinnis*, 319 F.Supp. 901 (S.D.N.Y.1970); was confirmed by the Supreme Court in *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974).

■ This leaves for examination the "different considerations [which] come into play in the case of mass mailings." The first consideration is that in this case, as in *Procunier*, the regulations in question affect more than just the inmates. By censoring incoming publications the state has also placed a burden

on freedom of the press. *Grosjean v. American Press Co.*, 297 U.S. 233, 248–50, 56 S.Ct. 444, 448–49, 80 L.Ed. 660, 667–68 (1936). *Cf. Pell v. Procunier*, 417 U.S. at 829–35, 94 S.Ct. at 2807–10, 41 L.Ed.2d at 505–09. Furthermore, the nature of the material being censored, impersonal publications of general circulation, open to inspection and even subscription by the prison administration, necessarily poses much less of a security risk to the institution than does regular mail, in closed envelopes, intended to communicate a particular, personal message from the sender to the addressee.[14] For these reasons I concur with those courts which have held that in order to censor incoming publications, prison administrators must *at least* comply with the standards set out in *Procunier v. Martinez*. *Hopkins v. Collins*, 411 F.Supp. 831 (D.Md.1975); *Aikens v. Lash*, 390 F.Supp. 663, 667 (N.D.Ind. 1975); *Gray v. Creamer*, 376 F.Supp. 675, 678 (W.D.Pa.1974); *McCleary v. Kelly*, 376 F.Supp. 1186, 1192 (M.D.Pa.1974).

**14.** Evidence of the lesser threat posed by publications is the difference in censorship regulations enforced by the United States Bureau of Prisons. Compare the regulation governing personal correspondence, Policy Statement 7300.1A, set out in *Procunier v. Martinez*, 416 U.S. at 414–15 n. 14, 94 S.Ct. at 1812, 40 L.Ed.2d at 240–41, with the regulations governing incoming publications, Policy Statement 7300.42B(4).

"a. Publications, including books, must come directly from the publisher. Executive officers of the following institutions may authorize exceptions to this rule: Morgantown, Englewood, Pleasanton, Ashland, Seagoville, Allenwood, Eglin, Montgomery, Safford and the Lompoc Camp.

b. Unless a publication will be detrimental to the security, good order and discipline of the institution, it will not be barred from admittance to the institution.

c. Prior approval will not be necessary for an inmate to subscribe to a publication. However, if upon examination of three issues, not necessarily successive, it is determined that a publication is unacceptable, it may be prohibited from the institution on the basis of paragraph 4b above. It is expected, however, that a further review of such publication should be initiated six months subsequent to the date the publication was originally or previously barred.

d. Caution will be exercised before declaring a publication unacceptable because of its religious, philosophical, social or sexual views. As indicated in 4b, above, the decision not to forward a publication to an inmate under this Policy Statement must be based on a showing that doing so will clearly compromise the security, discipline and good order of the institution.

e. Where a publication is unacceptable under this Policy Statement, the head of the institution shall make a complete record of the reasons for finding the publication unacceptable. The head of the institution will notify the publisher by letter (1) that a particular publication is unacceptable and will not be delivered to the inmate addressee, (2) the reason the publication is being rejected, and (3) that he may obtain an independent review of the rejection by writing to the Regional Director within fifteen (15) days of the letter. The inmate addressee will be advised of the rejection by a copy of the letter to the publisher.

f. A reasonable limit shall be placed on the number of publications an individual may retain in quarters."

As the Supreme Court noted in *Procunier, supra,* the nature of this policy, although not controlling, is relevant to a determination of the need for the restrictions employed by the State of Connecticut.

*See also Paka v. Manson,* 387 F.Supp. 111 (D.Conn.1974).[15]

## A. *The Rejection Criteria*

Having established that the *Procunier* standards apply, it remains only to test the Connecticut regulations against the double requirement of serving a justifiable government interest and being no broader than necessary to accomplish that purpose, even after a consideration of the leeway the officials must have in overseeing the institutions.

The plaintiff challenges four of the criteria set out in note 8 *supra,* which allow the prison to reject publications which:

"(3) advocate disruption within institutions or in the community;

(4) have demonstrably caused disruption within institutions or in the community;

(5) advocate racial, religious or nationality hatred; [or]

(9) obstruct rehabilitative objectives."

■■ Criteria 3 and 4 are impermissibly overbroad and therefore violate the second *Procunier* standard. Each of these regulations is deficient in three ways. First, the word "disruption" is overbroad in that it could encompass behavior which, although posing no actual threat to the security or order of the institution, displeases the prison administration.[16] Second, the regulations are not narrowly tailored to ban only those publications which pose a real threat to the security and order of the institution. While the "clear and present danger" test may not be applicable to threats within the institution,[17] it is clear that an acceptable regulation must be "narrowly drawn to reach only material that might be thought to encourage violence . . . ." *Procunier v. Martinez,* 416 U.S. at 416, 94 S.Ct. at 1813, 40 L.Ed.2d at 242.

■ Finally, while the prison has a legitimate concern with publications which advocate criminal activity in the community as well as in the institution, *Procunier,* 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240, I hold that in order to be within the reach of a constitutional ban concerning proposed activity *outside* the institution, the publication must present a clear and present danger of the occurrence of the criminal activity. *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).[18]

■ For similar reasons criterion 5 is also an impermissible restraint. If anything, this regulation is more restrictive than the similar regulation struck down in *Procunier,* 416 U.S. at 416, 94 S.Ct. at 1812, 40 L.Ed.2d at 241. Like that regulation, criterion 5 is not "narrowly drawn

---

**15.** This same holding was necessarily implied in *Paka. See* note 1 *supra.*

**16.** *See Paka v. Manson,* and note 1 *supra.*

In their brief, the defendants argue that because the plaintiff has been convicted of inciting injury to persons or property, and because he has previously been disciplined in the prison for conspiracy to create a disturbance, he should understand the meaning of the word "disruption." This argument, in addition to being illogical, misses the difference between a due process vagueness challenge, which attacks the amount of notice given by a regulation, and a first amendment overbreadth challenge, which attacks the fact that the regulation encompasses protected as well as unprotected expression and permits the authorities an impermissible range of discretion.

**17.** *But cf.* the new regulations accepted by the district court and set out by the Supreme Court in *Procunier,* 416 U.S. at 416–18 n. 15, 94 S.Ct. at 1813, 40 L.Ed.2d at 242, which banned all letters which "contain[ed] information which if communicated would create a clear and present danger of violence and physical harm to a human being." And under the Federal Bureau of Prisons Policy Statement, set out in note 14 *supra:*

"the decision not to forward a publication to an inmate under this Policy Statement must be based on a showing that doing so will clearly compromise the security, discipline and good order of the institution."

**18.** Assuming that a publication did present such a danger it would already be banned from Connecticut institutions under criterion 10, since it "would be unacceptable under U. S. Postal Regulations."

to reach only material that might be thought to encourage violence. . . "

 The last of the challenged criteria, number 9, is the most objectionable of all. This regulation, as did the regulations in *Procunier,* "fairly invite[s] prison officials and employees to apply their own personal prejudices and opinions as standards for prison mail censorship."[19] 416 U.S. at 415, 94 S.Ct. at 1812, 40 L.Ed.2d at 241. While this court admits that it is the prison administrators who are the experts in rehabilitation, that expertise should enable them to draft narrow regulations barring publications which adversely affect a prisoner's rehabilitation. The first amendment will not allow a catchall regulation which permits the exercise of unbridled discretion.[20]

**B. *The Appeals Process***

 The appeals procedure set out earlier in this opinion manifests a fundamental misunderstanding on the part of prison officials of the effect of the first amendment on their power to regulate and censor incoming publica-

tions. The burden can never be on the prisoner or publisher to obtain approval of a publication before it will be allowed into the prisons. Under the first amendment, every issue of every publication received at the prison is presumptively entitled to admission. *Cf. Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). It is only when the individual publication actually poses a tangible threat, of more than negligible imminence, to the order and security of the prison that it may be rejected. The burden is always on the prison administration to justify the rejection of each item and the burden is a substantial one. *Cf. Fortune Society v. McGinnis,* 319 F.Supp. 901 (S.D.N.Y.1970).

 For this reason the appeals process set out in Administrative Directive, ch. 3.7 (July 1, 1975) is defective in two respects. First, it is defective because although it requires that notice of rejection and specific reasons be given to the addressee,[21] it does not require that similar notice be given to the publisher. While the publisher may have an independent right to contest the rejec-

19. And according to the testimony of Craig Warren, the former librarian at Somers, this was the frequent result.

20. In the course of the hearing, a large number of allegedly prohibited publications were submitted as exhibits by the plaintiff. While this court has not been asked to pass explicitly on the acceptability of each issue, and while this would be especially difficult due to the confusion on the record as to which publications actually are at this time prohibited, it suffices to say that upon a casual perusal of each of these exhibits, this court found no issue which, in its opinion, actually threatened the order or security of the institution with sufficient imminence to justify its rejection under properly drawn regulations. Since this court does not desire nor intend to become the next appellate level in the prison "Library Committee" system, it is important that those officials responsible for censorship at the prison understand the burden which the Constitution places upon them. It is only because of the unique situation which exists in a prison that they are empowered to reject publications at all. When the decision to reject a publication is made, it must be made on their professional judgment of the serious threat posed by the

publication and not on their personal judgment concerning the merits of its contents.

21. The plaintiff also alleges that the reasons given for rejection of publications do not satisfy due process requirements. He has submitted three examples of notices he has received. In two of the notices no reason was given for the rejection. One of these, however, predated the new regulations which require reasons to be given. Administrative Directive, ch. 3.7, § 2(b)(3). It is not enough that the rejection notice recite the applicable criterion. *Cf.* Administrative Directive, ch. 3.7, § 2(b)(2). It must give a brief explanation of the reason that the publication has been rejected. This should include a reference to the article or articles found objectionable if less than the whole publication is faulted. A satisfactory reason serves two beneficial purposes; it focuses the arguments of those who wish to contest the rejection, and it alerts the appeals board to the explicit reasons for the rejection at the institution. *Cf. Haymes v. Regan,* 525 F.2d 540 (2d Cir. 1975); *United States ex rel. Johnson v. Chairman, N. Y. St. Bd. of Parole,* 500 F.2d 925 (2d Cir.), *vacated sub nom., Regan v. Johnson,* 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974).

tion of his publications, *see Pell v. Procunier,* 417 U.S. at 824–35, 94 S.Ct. at 2805–10, 41 L.Ed.2d at 502–09, I hold that the prisoner, himself, has the right to the publisher's aid in submitting written objections to the Library Committees. Since the prisoner will not have even seen the offending issue, he cannot be expected to marshal arguments in favor of its admission without the assistance of someone familiar with the material. Without the assistance of the publisher the prisoner's right to contest the rejection would be hollow indeed.

The procedure is also defective because it requires the prisoner to assemble several issues of a publication in order to have the publication "approved," or to contest the rejection of any particular issue. As I stated above, the presumption of acceptability attaches to *each issue,* and the burden is on the prison administration to justify the rejection of each issue as it is received. A political, social or philosophical bias on the part of the editors, be it pro-union, pro-racial separation, or anti-behavioral modification cannot justify an outright and total ban on a publication unless the offending issue contains material which actually poses a specific threat, of some immediacy, to the order and security of the institution.[22]

The plaintiff further contends that he must, as a matter of due process, be allowed to appear personally before the Library Committee in order to present his arguments in appealing a rejection. His argument is unpersuasive. Since the appellant would not, by definition, have even seen the rejected issue, it is doubtful that he could present any specific argument in support of his position. He must rely on the first amendment, and perhaps the support of the publisher, to present his case.[23] The due process clause does not require procedural safeguards as an end in themselves; there must be a demonstration that the safeguard in question will measurably increase the protection afforded the right at issue. *Cf. Mathews v. Eldridge,* —— U.S. ——, ——, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18, 32–34 (1976).

### III. *Attorney-Client Mail*

In his complaint, the plaintiff also seeks an order that the defendants cannot open letters from his attorneys, but must examine them for contraband by means of manual manipulation, fluoroscopy, or other similar technique. This claim has not been briefed, and, in light of the holding in *Wolff v. McDonnell,* 418 U.S. 539, 577, 94 S.Ct. 2963, 2985, 41 L.Ed.2d 935, 963 (1974), that in enacting a regulation which required the prisoner to be present when the mail was opened, prison officials "have done all, and perhaps even more, than the Constitution requires," it is clear that the claim must be denied.

### IV. *The Mail Screen Procedure*

During the hearing on the plaintiff's claim that his mail was being unlawfully delayed, it was discovered that for security reasons all non-privileged[24] mail addressed to the plaintiff was being opened and read by prison authorities. This procedure is authorized by department regulations.[25]

---

**22.** It is conceivable that the receipt of several consecutive offending issues could lower the burden for future issues of the same publication, and perhaps even justify a presumption of non-acceptability. *Cf.* United States Bureau of Prisons, Policy Statement 7300.42B, § 4(c). However, such a rejection would necessarily need to be reviewed on a regular basis, because, as the defendants here point out, it is not uncommon for the editorial viewpoint of a publication to change rapidly. The burden of acquiring issues for such a review must accordingly be upon the prison officials who have the burden of justifying the ban.

**23.** It is this very inability which compels notice to the publisher as a right of the prisoner, independent of the publisher's own right to notice.

**24.** Privileged mail is that sent by attorneys, courts, and governmental officials. Department of Correction, *Regulations,* § 5, 36 Conn. L.J. No. 33 (Feb. 11, 1975) at 25.

**25.** Department of Correction, *Regulations,* § 11, 36 Conn.L.J. No. 33 (Feb. 11, 1975) at 26 reads:

"(a) Under exceptional circumstances the review of both incoming and outgoing mail

■ While the plaintiff recognizes that prison officials can open and read prisoners' mail at random, or can open and read all incoming mail, *Wolff v. McDonnell*, 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935, 962 (1974); *Sostre v. McGinnis*, 442 F.2d 178, 199 (2d Cir. 1971), *cert. denied sub nom., Oswald v. Sostre*, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), he seeks to challenge the singling out of an inmate for special supervision under both the due process and equal protection clauses of the fourteenth amendment.

■■ Since the plaintiff has no expectation of privacy, *Sostre v. McGinnis*, and since the state regulation provides notice of the prison officials' right to open the mail, the plaintiff has failed to state a due process claim. Before any substantial disciplinary action can be taken against a prisoner based on information obtained in a mail screen, he will have the normal right to a due process hearing. *Sostre*, 442 F.2d at 203.

■ The plaintiff's equal protection claim likewise must fail because the regulation and practices of the prison officials, as proven at the hearing, are tailored to ensure that no screen is undertaken against a particular prisoner unless there is reason to suspect a threat to the security or order of the institution or that the incoming mail could pose a threat to the well-being of the prisoner

may be authorized in writing by the warden. Authorization to review mail may be given on a finding by the warden that there are indications creating a reasonable belief that:
1. Correspondence concerns sending contraband in or out of the institution or contains contraband.
2. Correspondence concerns plans to escape.
3. Correspondence concerns plans for activities in violation of institutional rules.
4. Correspondence concerns plans for criminal activity to be conducted within the institution.
5. Correspondence itself is in violation of institutional rules.
6. Correspondence contains material which would cause emotional trauma to the inmate or provide some suggestion of inmate emotional state as a potential suicide case.

himself. *Cf. Moss v. Hornig*, 314 F.2d 89 (2d Cir. 1963).

Consequently, I hold that the defendants in this action invaded no constitutionally protected interest of the plaintiff when they, for a limited period of time, with adequate administrative procedural safeguards, and for a specified purpose, opened and read all of the plaintiff's incoming mail.

## V. *Violations of Prison Mail Regulations*

The plaintiff also alleged, and the defendants admitted, that on several occasions privileged mail was opened out of the plaintiff's presence, in violation of the Department's regulations, and possibly of his constitutional rights. *See Wolff v. McDonnell*, 418 U.S. 539, 575–76, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935, 961–62 (1974).

■ The defendants claim that these occasions were accidents and that accidents are bound to occur in an operation as large as that at Somers prison. While it is perhaps significant that at least four mistakes happened to a single plaintiff within a relatively short period of time, this inference is not sufficient to overcome the holding of *Morgan v. Montanye*, 516 F.2d 1367 (2d Cir. 1975).[26] That case held that without explicit proof of damages, an occasional violation of attorney-client mail regulations in a prison did not state a claim cognizable

"(b) The authorization to review mail shall be in writing by the warden and shall state:
1. The name of the inmate whose mail, both incoming and outgoing, may be reviewed.
2. The reason/s upon which the approval is based.
3. The time period for which review is approved. Authorization to review mail may extend for a period not to exceed 60 days, renewable only upon written application to the Commissioner of Correction.
"(c) On the last day of each month, each warden will provide the Commissioner of Correction with a list of names of those inmates whose mail is under review."

26. *But cf.* Judge Oakes' dissent from the denial of a petition for rehearing *en banc* 521 F.2d at 693.

under § 1983. The plaintiff's claim must therefore be denied.

### VI. *Conclusion*

In conclusion, the four criteria for the rejection of publications challenged by the plaintiff, and the specific parts of the appeals procedure set out above are declared to be violations of the plaintiff's rights under the first amendment, made applicable to the states by the fourteenth amendment. In all other respects the plaintiff's claims are denied.[27]

SO ORDERED.

---

**27.** On March 4, 1976, the plaintiff submitted to this court 61 identical letters, each signed by a different inmate. The plaintiff admits that he typed each of the letters and solicited the signatures of the inmates. Each letter, styled a civil rights complaint, alleges identical violations of the inmate's first amendment rights in that prison officials allowed his mail to be "delayed, read, censored and in some cases lost." These allegations are identical to the issues decided in this opinion. Therefore this court will treat each letter as a motion to intervene pursuant to Rule 24(b), Fed.R.Civ.P. Each motion is denied.