**John VODICKA and Gary Tyler,
Plaintiffs-Appellants,**

v.

**C. Paul PHELPS, Individually and in his
capacity as Secretary for the Department of Corrections for the State of
Louisiana, et al., Defendants-Appellees.**

No. 78–3081.

United States Court of Appeals,
Fifth Circuit.

Aug. 20, 1980.

R. James Kellogg, Mary E. Howell, New Orleans, La., for plaintiffs-appellants.

J. Marvin Montgomery, Asst. Atty. Gen., Baton Rouge, La., for defendants-appellees.

Before GODBOLD, TJOFLAT and SAM D. JOHNSON, Circuit Judges.

GODBOLD, Circuit Judge:

Appellant Vodicka is the director of an organization called the Louisiana Coalition on Jails and Prisons (LCJP), a private group whose stated purposes are to assist prison inmates and former inmates and to lobby for prison reform. The LCJP publishes a newsletter called "Inside". This suit arises from the refusal of Louisiana corrections officials to permit a mass mailing of 500 copies of the July 1977 issue of "Inside", sent through the mail to prisoners at the Angola [Louisiana] prison, to be delivered to them. Issues of "Inside" mailed to Angola before July 1977, and issues mailed there since, have not been interfered with.

The warden of Angola made the initial decision not to permit the newsletter to be distributed, because he deemed it an "immediate threat to the security of the institution." The warden then referred the matter to the Secretary of Corrections, appellee Phelps, who, after meeting several times with Vodicka, affirmed the warden's decision. On August 3, 1977, Phelps returned the newsletters to Vodicka with a letter giving the reasons for his refusal. Subsequent newsletters from the LCJP were permitted into Angola without incident.

On September 6, 1977, Vodicka and an Angola inmate on the LCJP's mailing list sued both Phelps and the warden, challenging the constitutionality of regulations governing the admission into a prison of publications sent through the mails. The suit was brought under 42 U.S.C. § 1983, and plaintiffs sought injunctive and declaratory relief as well as damages and attorneys' fees. The court found the regulation constitutional both on its face and as applied. Plaintiffs appeal.

I. Facial constitutionality

■ The regulation in issue is ¶ 4(c) of Regulation 30–19, issued by the Secretary of Corrections on December 3, 1976, entitled Correctional Services, Inmates Visiting and Correspondence (Adult):

c. Publications. Books, magazines, newspapers and printed matter which may be legally sent through the postal system shall be approved for inmates, unless deemed to constitute an immediate threat to the security of the institution.

If it is determined that a publication passed through the mails illegally or that it presents an immediate threat to the security of the institution, it may be withheld from the inmates. Inmates shall be notified in writing of this action and shall have the opportunity to appeal this decision to the warden or superintendent and then to the Secretary.

Vodicka asserts that the phrase "an immediate threat to the security of the institution" is ambiguous, fails to give notice of what items are unacceptable, and vests unbridled discretion in administering officials, and that a more narrowly drawn regulation could achieve the same purpose.

■ The regulation is not facially invalid. The standard under which it is to be tested is articulated in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). The regulation "must further an important or substantial governmental interest unrelated to the suppression of expression", and "must be no greater than is necessary or essential to the protection of

the particular governmental interest involved." *Id.* at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240. Prison security is an important governmental interest that may justify suppression of prisoners' mail. *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 502 (1974). Unlike the regulation at issue in *Cofone v. Manson,* 409 F.Supp. 1033 (D.Conn.1976), relied on by Vodicka, which allowed suppression of mail that might cause a "disruption" within the prison, the regulation involved here is "more narrowly tailored to ban only those publications which pose a real threat to the security and order of the institution." *Id.* at 1040. The regulation is neither vague nor overbroad; suppression under the regulation requires a showing that the publication is in fact detrimental to a legitimate governmental interest. The language is clear.[1]

## II. Constitutionality as applied

■ We judge the constitutionality of the actual suppression by the standards enunciated in *Procunier v. Martinez, supra,* and *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier, supra,* 417 U.S. at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501. The suppression must be as limited as possible, consistent with the governmental interest involved. *Procunier v. Martinez, supra,* 416 U.S. at 413, 94 S.Ct. at 1811, 40 L.Ed.2d at 240. *See also Guajardo v. Estelle,* 580 F.2d 748, 760 (5th Cir. 1978). As noted above, prison security is a legitimate governmental interest; the questions then remain whether (a) the suppression was reasonably necessary to prison security, and (b) the means by which that security was safeguarded were sufficiently narrow.

Distribution of the newsletter to Angola inmates was banned because of its lead article entitled "Protest at Angola". Secretary Phelps informed Vodicka that the newsletter would be allowed into the prison if the lead article were deleted. The article concerned a work stoppage that had occurred at Angola approximately five weeks before the newsletter was sent to the prison. No other issue of "Inside" was banned from Angola, and the July newsletter itself was allowed into other institutions.

Angola is a maximum security prison housing 3,000 to 4,000 inmates. Most are serving long sentences for the commission of violent crimes and are generally considered "hard core" prisoners. On May 25, 1977, a work stoppage occurred at Angola involving 800–900 inmates. Inmates boycotted the dining hall at breakfast. When sent to their job assignments, the inmates involved engaged in a work slowdown. Prison officials declared an emergency and sent in a tactical unit to end the work stoppage. Some inmates were locked in their cells and dorms, others were sent to new prison camps. Violence was kept to a minimum, and only a few inmates were injured. The disturbance lasted one day, but tension at Angola persisted long after the work stoppage ended.

During the disturbance inmates sought to have the governor, members of the press and Vodicka come to the prison to meet with them. The warden denied the requests but met with representatives elected by the inmates to discuss inmate grievances.

Before the May 1977 work stoppage Vodicka and the LCJP had worked with and corresponded with a number of inmates at Angola. They had had disputes with corrections officials. They had sent a number of pamphlets and flyers to inmates at Angola. Some of the pamphlets contained information about the proposed formation of a prisoners' union at Angola. One pamphlet was entitled "Tear Down the Walls."

---

1. Vodicka contends that the district court judged the facial constitutionality of the regulation by an incorrect standard. Whatever the merit of that contention, the argument is pretermitted by our finding the regulation consti-

tutionally valid under the *Procunier v. Martinez* standard, conceded to be the applicable standard by all parties. *See Guajardo v. Estelle,* 580 F.2d 748 (5th Cir. 1978).

The court found, on adequate evidence, that Vodicka and the LCJP have articulated goals and policies that directly conflict with the goals, procedures and policies of the Louisiana Department of Corrections and have had many disputes regarding the policies and procedures followed at Angola and the manner in which the prison is operated.

Warden Maggio described the May incidents as stopping operation of the prison. According to him, the work stoppage was directly related to shakedowns being conducted at the prison, legislative debate on bills affecting inmates that were unpopular among the inmates, and literature mailed to the inmates by Vodicka. In his opinion Vodicka's involvement at Angola was one cause of the May disturbance and Vodicka was "associated with" the stoppage.

In his letter to Vodicka refusing to allow distribution of the newsletter, Secretary of Corrections Phelps referred to material that had been furnished to him by Vodicka, some of which had been mailed to inmates at Angola:[2]

I am returning the letter and membership card your organization sent to a number of inmates at Louisiana State penitentiary.

After reviewing this material you sent, along with the material you provided us on July 19, 1977, it is my opinion that the stated activities of the Louisiana Coalition on Jails and Prisons constitutes a threat to the security and the orderly operation of LSP.

I have particular reference to your published statement that the LCJP exists to "Encourage convicts, ex-offenders and friends and families of prisoners to come together to make themselves heard and to demand that changes be made by our elected officials and prison administrators. The LCJP seeks to empower those who have never had a voice in the system."

The letter and cards indicating membership in the Southern Coalition on Jails and Prisons constitutes a solicitation for concerted group activity at a maximum security institution. The attempt to establish such organized participation by inmates at LSP increases the burdens of administration and constitutes a threat of essential discipline and control. LSP is not a public forum and an attempt to organize the inmates to work toward accomplishing the stated goals of the Coalition could easily lead to friction between inmates as well as between inmates and prison personnel. While the goals of your organization may be worthwhile, the focus is on the redress and/or change of the entire dilemma of incarceration. Placing the inmates at LSP in an adversary relation with the Department of Corrections in its attempt to perform its duties as required by state law creates a potential for trouble. That potential must be avoided.

With particular respect to the newsletter, Phelps set out a number of facts and circumstances that combined to cause his decision.

1. The basic conflict between the goals of the LCJP and of the prison. Secretary Phelps wrote:

The position statement for the LCJP states that you seek the "decarceration" of people now in prison; that prisons teach nothing but crime; that a prisoner's civil rights should follow him into prison; that prisoners should be paid wage equal to that on the free market; that inmates should be encouraged to organize for their own self-improvement; that prison officials should not be empowered to punish inmates for acts they "might" commit, that the LCJP encourages convicts, ex-offenders and friends and families to come together . . . to empower those who have never had a voice in the system; and, that prison is an irresponsible answer to social and crime problems.

As I have already stated, Louisiana State Penitentiary at Angola is a long-term maximum security facility. The only

---

**2.** There is no dispute concerning admission or banning of these materials. They are, however, relevant to Phelps' decision to exclude the July 1977 newsletter.

way someone there is going to become "decarcerated" is according to the methods currently available under the laws of this state, those being parole, pardon, good time discharge, and full term release.

. . . As of yet, there is no statutory provision allowing felons to serve their sentences at other than hard labor. There is no provision in the law of this state allowing the Department of Corrections to pay prevailing wages for labor performed by inmates.

I could go into further detail about those aspects of the goals of the LCJP which are at odds with the goals and duties of the Department of Corrections in relation to the maximum security facility at Angola, but I feel that what I have stated above is sufficient to indicate the basic conflict. Further, the goals stated by the LCJP which do relate to the goals of the Department of Corrections dealing with preparing the offender for his release are more related to the type of inmates that are housed at other institutions besides Angola; these being Dixon, LCIS, Camp Beauregard, Jackson Barracks, Camp Woodworth, and State Police Barracks, as well as the Probation and Parole Division of this Department. These are the programs which have persons who soon will be, or are already on the streets. The discharge rate at Angola is negligible. Therefore, I am of the opinion that the LCJP treads on tenuous ground when it presents these goals and attempts to realize them within the confines of Angola. When the hopes of confined persons are raised beyond the level of expected realization, their frustration will be expressed in a manner that endangers the security and order of the institution. This has occurred in the past, and in fact quite recently at Angola with the occurrence of the work stoppage at LSP in late May, 1977.

2. With respect to the objectionable article about the work stoppage, Phelps wrote:

Angola was just beginning to quiet down and get back to normal when the LCJP "Inside" was received. The lead article concerns the work stoppage that had occurred in May, referring to it as a protest which was "peaceful." The entire tone of the article gives this action on the part of this large group of inmates the appearance of the "stamp of approval" of the LCJP. It is my opinion an appearance that the LCJP believes in work stoppages, however subtle the encouragement, will have a deleterious effect on the ability of this Department to control the behavior of the inmates. Further, the article outlines in detail with supporting allegations to justify each point, the so-called grievances of the inmates involved in the work stoppage. I see this as an attempt to crystallize and present to the entire population a unified theme which could be used as a rallying point for further unrest. While I do not know if you were aware of this possible effect of the article, I am certain that very few of the inmates who participated in the work stoppage were aware of what their "grievances" were. The dissemination of this article will provide not only those inmates who participated in the work stoppage, but also the thousands that did not with a theme far better expressed than the one put forth by the inmates who represented the persons participating in the work stoppage.

As I have stated before, conditions at Angola are better than they ever have been. This improvement is due to the responsiveness of this state to the orders of Judge West in the *Williams v. McKeithen* lawsuit. Angola remains under the close scrutiny of the court, on practically a daily basis. If conditions were so outrageous at Angola as your article implies, I doubt seriously that this would go undetected by the court. Your allegations of civil rights violations at Angola become fact in the minds of many prisoners, regardless of the fact that the federal district court will certainly redress any violations it learns of. The very "harassment" complained of in your article is the direct result of the court's attempt to protect inmates from themselves by thorough and routine searches.

Further, the article states, "Prison officials, Maggio included, insist that injuries were minimal, saying that as few as five prisoners were beaten by tactical unit personnel." Neither I nor Warden Maggio have stated that anyone was beaten by the tactical unit. We have not stated that anyone was beaten. Yet the statement is there in your article and the implication is clear that officials of the Department used excessive or unnecessary force and violence against peaceful inmates. Errors in reporting such as this, are extremely damaging to inmate-staff relationships within the institution and merely serve to heighten tensions. Once such a misstatement is made, it is impossible to undo the damage done.

Phelps' objections to the article, and his belief that distribution of the newsletter would cause further unrest, were grounded on a number of facts, set forth in the portions of the letter quoted above:

(a) Phelps considered that the tone of the article appeared to give approval to the May work stoppage.

(b) The article included a list of "so-called grievances" of the inmates involved in the work stoppage with supporting allegations tending to justify each, and Phelps felt that this list of previously unarticulated grievances might serve as a "rallying point" for further unrest.

(c) The harassment complained of by the article (the shakedowns) was the result of an attempt by the federal district court to protect inmates from themselves by thorough and routine searches. This explanation of the shakedowns was not given in the article, and the shakedowns were thus portrayed as a grievance rather than as a court-ordered procedure for the inmates' own protection.

(d) The article falsely stated that prison officials had said that during the May disturbance prisoners were beaten by the tactical unit. Phelps stated that once such a misstatement is made, it is impossible to undo the damage.

Phelps testified at trial that prison officials had been through a trying and difficult time and that they were still tightening security in July. He stated that the atmosphere was still "very very tense." He testified that prison officials had just completed a series of meetings with Vodicka on the operation and problems of the prison. His trial testimony generally mirrored the letter written to Vodicka, and he testified that he believed the newsletter would rekindle the disturbance.

The district court held that the regulation was not applied in an unconstitutional manner. It found that prison officials reasonably believed that the newsletter constituted an immediate threat to the security of the prison. Prison officials under these circumstances need not "show with certainty that adverse consequences would flow from the failure to censor [the material]. Some latitude in anticipating the probable consequences of allowing certain speech into a prison environment is essential to the proper discharge of an administrator's duty." *Procunier v. Martinez, supra,* 416 U.S. at 414, 94 S.Ct. at 1811, 1812, 40 L.Ed.2d at 240. The district court found that prison officials had discharged their burden of showing the likelihood of adverse consequences, and we are not able to say that the district court erred in reaching this conclusion.

The core of the district court's decision concerns the May work stoppage and its continuing consequences. The court found that after it occurred prisoners were relocated, which caused much animosity among prisoners against prison officials, cliques were broken up, friends separated, and work assignments changed. All of this contributed to "long term dissatisfaction and tension, which in the defendants' opinion, could have erupted in a confrontation with the prisoners if the July 1977 'Inside' had been allowed into the prison. Based on these considerations, the defendants concluded the newsletter was a threat to the security of the prison." The court found it could not conclude that the situation as it existed in late May had substantially altered by July.

The court expressly noted the prior relationships and difficulties between Vodicka and the LCJP and prison officials. Vodicka contends it was improper to consider that

prison officials had been at odds with the goals of Vodicka and the LCJP. The difference over goals, however, was not employed as a plenary basis to keep "Inside" out of Angola or other institutions in the Louisiana prison system. Previous and later issues came into Angola unhindered, the July issue went into other institutions unhindered, and the warden was willing to let the July issue in except for the lead article. To the extent that a difference in goals was a factor it was a particularized one, considered only insofar as it affected the specific situation existing at Angola when the July newsletter arrived. Moreover the decision was not based on mere differences between Vodicka and officials over goals. Prison officials, on the scene and charged with maintenance of prison security, were of the opinion that one of the factors causing the May work stoppage was material previously mailed into the prison by Vodicka. Included in materials previously mailed in were solicitations to join a prisoners' union, and the "Tear Down the Walls" pamphlet. The occurrence and disruptive consequences of the work stoppage, and the opinion of prison officials of its continuing effect, are not seriously disputed. Under these circumstances we cannot say that the district court erred in its conclusion that the prison officials were reasonably justified in excluding the newsletter as a threat to security.

Prison officials did not bar inmates from access to news stories about the work stoppage. Copies of the *New Orleans Times-Picayune*, containing a substantially similar news story, came into the prison. Vodicka insists that this shows that the identity of the spokesman rather than the content of the newsletter was the basis for the ban. The testimony referred to inaccuracies in the newsletter article; we do not know whether these same inaccuracies were present in the *Times-Picayune* story. Even if the same inaccuracies existed in the latter, however, the court could properly consider the identity of the spokesman under the circumstances we have outlined.

Prison officials did not comply with the provisions of the regulation requiring that they notify each potential recipient of the newsletter that it would not be distributed. We agree with the district court that this does not justify relief. Prison officials met with publisher Vodicka promptly and more than once, considered not only the newsletter but other material submitted by him, and gave him a prompt reply. Officials reasonably believed that official notification to the inmates of the suppression might rekindle the disturbance. Under the circumstances, no further purpose could be served by notifying the inmates, and notification was therefore not required.

Finally, Vodicka asked the district court to order that the July 1977 newsletter be admitted to the prison at the time of trial, in December 1977. The district court declined to do so on the grounds that corrections officials should first be given an opportunity to consider the effect the newsletter would have on present conditions at Angola. Vodicka has not attempted to remail the newsletter, and thus no prison official has ruled on its present admissibility. The issue is therefore not ripe for judicial review.

AFFIRMED.