Lawrence A. JACKSON, Auburn State Prison, Auburn, New York, Frank Cole, Green Haven State Prison, Stormville, New York, Floyd L. Couse, Auburn State Prison, Auburn, New York, Edward J. Bardo, Attica State Prison, Attica, New York, Thomas Hazelton, Green Haven State Prison, Stormville, New York, Warren Scarberry, Attica State Prison, Attica, New York, the Mattachine Society, the Fortune Society, Plaintiffs,

v.

Benjamin WARD, Commissioner of Correction of the State of New York, Governor Alfred E. Smith Office Building, State Office Building, Albany, New York, Harold J. Smith, Superintendent of the Attica Correctional Facility, Attica, New York, Robert J. Henderson, Superintendent of the Auburn Correctional Facility, Auburn, New York, Leon Vin-

cent, Superintendent of the Green Haven Correctional Facility, Stormville, New York, Individually and in their official capacities, Defendants.

Joseph P. LITTLE and Richard Clark, Petitioners,

v.

Vincent R. MANCUSI, Superintendent of Attica Correctional Facility, and William A. Dickinson, Educational Supervisor and Censor, Respondents.

Calvin JOHNSON, Plaintiff,

v.

Vincent R. MANCUSI, Superintendent, Attica Correctional Facility, Defendant.

Application of Carl JONES.

Application of Gary R. HAYNES.

George NIEVES, Petitioner,

v.

School Supervisor Mr. DICKERSON, Respondent.

Application of Edward VOGT and Charles Jackson.

Nos. Civ–1969–435, Civ–1971–101, Civ–1971–131, Civ–1972–11, Civ–1972–12, Civ–1972–23 and Civ–1973–289.

United States District Court, W. D. New York.

Sept. 13, 1978.

---

Herman Schwartz and Edward I. Koren, Washington, D. C., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of State of N. Y. (Douglas S. Cream, Asst. Atty. Gen., Buffalo, N. Y., of counsel), for defendants.

CURTIN, Chief Judge.

When this civil rights action under 42 U.S.C. § 1983 was first filed with the court on November 26, 1969, six named inmates and the Mattachine and Fortune Societies challenged the guidelines and procedures of the New York Department of Correctional Services governing the review by corrections officials and the receipt of literature by inmates in New York State correctional facilities. Plaintiffs sought a declaratory judgment and preliminary and permanent injunctive relief against the Commissioner of Correction and the wardens of the Attica, Auburn, and Green Haven State Prisons.

Plaintiffs originally complained that the defendants had continually denied them access to certain books, magazines, newspapers, and other publications including Arthur Koestler's *The Ghost in the Machine*, Peter Gay's *The Enlightenment*, Erik Erikson's *Youth and Crisis*, Claude Lévi-Strauss' *The Savage Mind*, Marshall McLuhan's *Understanding Media*, Charles Silberman's *Crisis in Black and White*, the Fortune Society's *Newsletter, Psychology Today*, and *National Geographic*. Plaintiffs alleged that such denials were arbitrary, discriminatory, based solely on whim and caprice, and deliberately repressive. The complaint alleged that the denials were not based on any objectively valid criteria and were not rationally related to goals of the prison system. Plaintiffs also alleged that the denials had been made without the establishment of and compliance with any objective and valid procedures for screening publications coming into the penal institutions. In additional causes of action, the plaintiffs alleged that defendants had adopted policies and engaged in practices that prohibited the plaintiffs from corresponding with anyone that was not approved by the defendants and that they had thus been prohibited from corresponding with public figures, religious leaders, governmental units, friends and relatives. Plaintiffs alleged that it was the defendants' regular practice to censor all mail coming into New York's penal institutions, including legal mail and correspondence with the courts. Plaintiffs sought injunctive relief against the continuation of these policies and sought the establishment of objective and rational policies as well as appropriate implementing procedures.

By my order of December 21, 1970, I recognized that it was appropriate for this lawsuit to proceed as a class action. In the original complaint, plaintiffs had sued on their own behalf and "in behalf of all other inmates in prisons under the authority of the Commissioner of Correction and the other defendants."

Since the original action was instituted, Benjamin Ward has become the Commissioner of New York State Department of Correctional Services, Harold J. Smith has become the Superintendent of the Attica Correctional Facility, Robert J. Henderson has become the Superintendent of the Auburn Correctional Facility, and Leon Vincent has become Superintendent of the Green Haven Correctional Facility. These individuals, as successors in office of the original and succeeding named defendants, are hereby substituted as the defendants in this action.

After the original action was filed, related actions were filed by a number of pro se inmate litigants. Extended negotiations among the parties, several meetings with this court, and decisions by other courts led to substantial revisions of the challenged practices and procedures.

On April 29, 1971, the Department of Correctional Services issued Administrative Bulletin No. 2. This Bulletin stated that it was the policy of the Department of Correctional Services

> to allow access by inmates to literature and related materials for either program or private individual use. Accordingly, inmates shall be allowed to subscribe to or to receive from authorized correspondents a wide range of books, magazines, and newspapers.

However, the Bulletin contained the following proviso:

> There are, however, some inmates whose emotional instability and antisocial attitudes are such that the [consumption][1] of certain reading material may lead to individual behavior or behavior by groups of inmates which threaten the safety and security of the institution for both staff and other inmates, and which deter the operation of a therapeutic program.

Administrative Bulletin No. 2 then set forth seven guidelines governing the acceptability of literature for inmates:

1. In general, the materials should be acceptable for regular mailing in the United States.
2. The publication should not appeal predominantly to prurient, shameful or morbid interest in nudity, sex, execretion [sic], sadism, or masochism, or go beyond the customary limits of candor in describing or representing such matters. (See Penal Law § 235.-00).
3. The publication should not defame, villify [sic] or incite hatred towards persons because of their race, religion, creed or national origin.

4. The publication should not advocate the violent overthrow of the existing form of government of the United States or of this state. (See Penal Law § 240.15).
5. The publication should not advocate lawlessness, violence, anarchy or rebellion against governmental authority or portray such conduct as a commendable activity.
6. The publication should not incite hatred or disobedience towards law enforcement officers or prison personnel.
7. The publication should not depict the use or manufacture of firearms, explosives and other weapons.

The Bulletin specified that a review committee was to be established by the Superintendent of each correctional facility to consider the publications which had been challenged as unacceptable. This review committee was then to report its recommendations to the Superintendent of the facility who in turn was directed to forward the committee's report and his decision to the Commissioner of Correctional Services. The Commissioner's office would then investigate further and would confer with the Superintendent before a final decision was reached. In the interim, the preliminary decision of the Superintendent was to be in effect. Bulletin No. 2 established certain time limits for the actions by the review committee, the Superintendent, and the Commissioner's office.

Responding to the order of Judge Mansfield in *Sostre v. Otis*, 330 F.Supp. 941 (S.D. N.Y.1971), the Department of Correctional Services issued a new set of regulations dated September 7, 1971, amending Administrative Bulletin No. 2.

Judge Mansfield had concluded that the procedures set forth in Administrative Bulletin No. 2 "would not satisfy the requirements of due process were it the mechanism

---

1. The original Bulletin No. 2 reads "consummation," an error that should not go unnoticed, especially in a bulletin concerned with litera-ture. This language has been revised in later bulletins.

by which censorship was imposed on literature in a free society outside prison walls." *Id.* at 944. He noted that the procedure was deficient in these respects: first, it was completely *ex parte* : notice need not be given either to the literature's publisher or to the inmate; second, it failed to place on the censors the burden of showing that censored literature was not "protected" and it seemed to permit a final restraint without any judicial determination; third, those affected by the censorship were not allowed an opportunity to be heard. He recognized that "certain literature may pose such a clear and present danger to the security of a prison, or to the rehabilitation of prisoners, that it should be censored." *Id.* He then ruled that inmates were entitled to the rudimentary due process protections of (1) notice, (2) some opportunity to object, either personally or in writing, and (3) a decision by a body that could be expected to act fairly. Judge Mansfield concluded that requirement (3) had been satisfied by existing procedures but he found that the essential elements of notice and an opportunity to be heard were lacking.

Administrative Bulletin No. 2, as amended, provided an additional guideline which read:

8. The publication should not be of such a nature as to depict, describe or teach methods and procedures for the acquisition of certain physical manipulations and skills which expertise will, in the opinion of Department authorities, constitute a threat to the safety, welfare and health of other inmates and employees.

Amended Bulletin No. 2 also provided for a revised review procedure for literature coming into the correctional facilities. Under this procedure, the Superintendent or his delegates had the initial responsibility to review incoming literature and to ascertain its acceptability under the eight guidelines. Each institution was directed to establish a "Media review committee." If the Superintendent or his delegate determined that a certain publication should be referred to the media review committee, the inmate to whom the literature was addressed was to be advised in writing immediately that such review would take place. The inmate was allowed an opportunity to provide written reasons, accompanied by book reviews or other material provided by the publisher, to support his claim that the publication should be released to him. After considering the record before it, the review committee would then submit its recommendation to the Superintendent who could uphold or reverse the recommendation. Acceptable literature would then be released to the inmate promptly. If the Superintendent agreed that a certain publication should be rejected, the literature would then be forwarded to the newly-established Departmental Media Review Committee in Albany with the remainder of the record.

The responsibility of the Departmental Media Review Committee was limited to review of those publications rejected for inmate reading by the various institutions' review committees. The Departmental Media Review Committee would evaluate the contested publication in accordance with the eight guidelines of Amended Bulletin No. 2 and would issue a final written determination as to the acceptability of literature referred to it. Each New York State Correctional Facility would then receive a copy of the Media Review Committee's determinations which would be binding on all correctional facilities. As a general rule, literature found to be acceptable for one correctional facility would be acceptable in all correctional facilities in New York State.

Corrections officials were then directed to revise Amended Administrative Bulletin No. 2 further to comply with Judge Gurfein's order of November 8, 1971 in *Sostre v. Otis*, 70 Civ. 1114 (S.D.N.Y. November 8, 1971) (unreported decision). Judge Gurfein found that the provision of Administrative Bulletin No. 2 that the newly implemented screening procedures must be exercised "in a reasonable period of time" was too vague. He ordered that the entire review procedure, including review by the Commissioner, must be completed within a period of six weeks and that this requirement must be

stated in the Bulletin. Judge Gurfein also directed that an inmate was to be informed of the category, by guideline number, under which a contested publication was being withheld.

Trial on the original complaint in *Jackson v. McGinnis*, Civ–1969–435, began on July 20, 1972. At that time plaintiffs' counsel moved, without opposition, to withdraw the second and third causes of action which had been alleged in the original complaint. These claims related to censorship of inmate correspondence. Plaintiffs then moved to have a three-judge court impaneled to rule on their request for injunctive relief. That motion was taken under advisement, and it was agreed that any testimony presented on July 20, 1972 would be considered by a three-judge court if such a court were to be impaneled. Plaintiffs then offered the testimony of George Bohlinger, who was serving as the Superintendent of the Massachusetts Correctional Institution at Norfolk, Massachusetts, and the testimony of Mr. Thomas Murton, who was a professor of criminology at the University of Minnesota. Defendants offered the testimony of Mr. Edward Elwin, who was employed as Deputy Commissioner of Corrections in charge of programs in New York State. Among Mr. Elwin's duties was coordination of the functions of the media review committees. Defendants also offered the testimony of Gordon Bissegger, an administrative assistant in the Department of Correctional Services, who was also a member of the Departmental Media Review Committee.

Following this testimony, plaintiffs indicated that they intended to file an amended complaint. The hearing was adjourned so that certain depositions could be taken and so that the plaintiffs could file their amended complaint.

An amended complaint was filed on February 14, 1973. The amended complaint challenged the guidelines and procedures which were then in effect for determining the publications that inmates of New York State correctional facilities might receive and read. It also challenged the "publish-ers only" rule that required that inmates could receive newspapers only directly from the publisher and not by way of a third party. It dismissed the second and third causes of action which had appeared in the original complaint. It also added additional plaintiffs and provided that certain defendants be replaced by their successors in office. Thereafter, it was stipulated that this amended complaint incorporated and consolidated the complaints which had been brought in the following civil actions: *Jackson v. McGinnis*, Civ–1969–435; *Little v. Mancusi*, Civ–1971–101; *Johnson v. Mancusi*, Civ–1971–131; *In the Matter of the Application of Carl Jones*, Civ–1972–11; *In the Matter of the Application of Gary R. Haynes*, Civ–1972–12; and *Nieves v. School Supervisor Mr. Dickerson*, Civ–1972–23. In addition, it now appears that this decision will be dispositive of the claims made in *In the Matter of the Application of Edward Vogt and Charles Jackson*, Civ–1973–289, and that case is hereby consolidated with the above-listed cases for the purposes of final decision.

More specifically, the amended complaint challenged the guidelines and procedures which are set forth in Administrative Bulletin No. 60, which had superseded Administrative Bulletin No. 2, as amended, on May 30, 1972. Administrative Bulletin No. 60, which is appended to this opinion in its entirety, incorporated much of the procedure and guidelines which had appeared in Administrative Bulletin No. 2. Administrative Bulletin No. 60 also contained the six-week time limitation which had been ordered by Judge Gurfein in *Sostre v. Otis*, 70 Cir. 1114, *supra*. It contained a "publishers only" rule with respect to newspapers, and it provided for a certain amount of reorganization of the procedures of the Departmental Media Review Committee. Administrative Bulletin No. 60 restated the eight guidelines which appeared in revised Bulletin No. 2, with the exception of Guideline No. 2, which reads in Bulletin No. 60 as follows:

2. In general, publications which appeal to prurient interests or which are ut-

terly without redeeming social value, or which clearly depict acts involving necrophilia, masochism, sadism, bestiality, or unnatural preoccupation with excrement, are not acceptable. Otherwise, literature dealing with the subject of sex is to be considered appropriate.[2]

Plaintiffs challenged Guidelines Nos. 2 through 6 as being both vague and overbroad on their face, permitting decisions on entry and exclusion of publications that are arbitrary, inconsistent, irrational and discriminatory, and precluding any possibility of a consistent and constitutional application. Plaintiffs alleged that defendants had denied plaintiffs and the class which they represent the right to receive and read various publications without any showing that allowing plaintiffs to receive and read such materials would constitute a clear and present danger to any valid penological goal. Plaintiffs alleged that the procedures set forth in Administrative Bulletin No. 60 were constitutionally deficient in that they failed to provide an adequate opportunity for inmates to support the admissibility of contested items, failed to require corrections officials to provide adequate explanations why certain items had been excluded, and failed to provide for a decision-making body that was sufficiently neutral. Plaintiffs sought declaratory judgment that the policies and practices violated the first, eighth, ninth, and fourteenth amendments, and they sought preliminary and permanent injunctive relief against enforcement of defendants' present policies and procedures and an order directing adoption of constitutional practices and procedures. In an appendix to the complaint, plaintiffs listed the books and other periodicals which were among those which they felt had been unjustifiably excluded under the guidelines. The books excluded under the guidelines were: *Black Feeling, Black Talk* by Nikki Giovanni, *Blood in My Eye* by George Jackson, *The Pearl, The Room* by Hubert Selby, Jr., *Die Nigger Die!* by H. Rap Brown, *The Naked Soul of Iceberg Slim* by Robert Beck, and *The Black Panthers Speak* edited by Philip S. Foner. Particular issues of the following periodicals were alleged to have been excluded: *Buffalo. Challenger, Rising Up Angry, Right On* and *Midnight Special.* The following newspapers were allegedly excluded under the "Publishers Only" rule: *Unidad Latina, Daily World, Black Panther, Rising Up Angry,* and *Pyongyang Times.*

Since plaintiffs sought more than simply declaratory judgment in this action at that time, a three-judge court was impaneled by the Honorable Irving R. Kaufman, Chief Judge, United States Court of Appeals for the Second Circuit, on August 27, 1973.

However, on October 16, 1973, plaintiffs moved to amend their complaint yet again. In this amendment, plaintiffs withdrew their attack on the media review procedures. They indicated that they did not intend to contest the "publishers only" rule.[3] They also withdrew their request for injunctive relief, thus obviating the need for a three-judge court. Defendants answered the amended complaint, and the trial continued on November 16, December 7, and December 12, 1973. During these hearings plaintiffs presented the testimony of several literary experts including that of author and critic Leslie Fiedler, professor of

---

**2.** There remains some question as to the actual wording of Guideline No. 2 which is presently in force. The phrase "which appeal to prurient interests" does not appear in the original Bulletin No. 6, dated May 30, 1972, nor in the rendition of Guideline No. 2 provided in the affidavit of the Assistant Attorney General dated June 30, 1978. There are, however, indications in the record that this phrase was added to Guideline No. 2. *See* Trial Transcript at 276–277.

**3.** Courts have since concluded that such a "publisher's only" rule impermissibly restricts the reading material available to inmates.

*Wolfish v. Levi,* 573 F.2d 118, 129–130 (2d Cir. 1978); *Cruz v. Hauck,* 515 F.2d 322, 333 (5th Cir. 1975), *cert. denied sub nom. Andrade v. Hauck,* 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976) (concerning legal publications); *Zaczek v. Hutto,* 448 F.Supp. 155 (W.D.Va.1978); *Rhem v. Malcolm,* 371 F.Supp. 594 (S.D.N.Y.), *modified* 507 F.2d 333 (2d Cir. 1974) (affirmed as to finding of unconstitutionality; remanded for further consideration of remedy); *Cooper v. Morin,* 91 Misc.2d·302, 398 N.Y.S.2d 36 (Sup. Ct., Monroe Co., 1977). *Cf. Woods v. Daggett,* 541 F.2d 237 (10th Cir. 1976).

American Literature at the State University of New York at Buffalo. Thereafter, the parties completed discovery and submitted their respective memoranda of law to the court.

On October 5, 1976, the Assistant Attorney General, who represents defendants, advised the court that Administrative Bulletin No. 60 continued to govern the media review procedures. The Assistant Attorney General has also advised the court that Guideline No. 3 had been revised effective October 13, 1976, to read:

3. The publication should not incite violence based on race, religion, creed or nationality.

On December 7, 1976, I directed the Assistant Attorney General to resubmit to the Departmental Media Review Committee those items which are set forth in Appendix B of plaintiffs' amended complaint. On January 19, 1977, the Assistant Attorney General filed an affidavit with the court which indicated that, according to J. Kevin McNiff, Chief Program Administrator for the New York State Department of Correctional Services, all of the contested books are now acceptable in New York State correctional facilities. However, in an additional affidavit filed with the court on June 30, 1978, defendants' counsel has advised the court that the periodicals listed in Appendix B of plaintiffs' amended complaint would still not be acceptable for admission into institutions under the jurisdiction of the New York State Department of Correctional Services. With this affidavit, the record in this case was finally closed.

Exclusion of the individual publications was plaintiffs' primary concern. *See* Affidavit of October 5, 1973, of Herman Schwartz. Plaintiffs have now realized a large part of their goal of having the contested publications admitted to New York State's penal institutions.

At this point, the primary remaining issue in this lawsuit is plaintiffs' request for a declaratory judgment that the policies of the New York State Department of Correctional Services as set forth in Administrative Bulletin No. 60, Guidelines Nos. 2 through 6, are vague and overbroad on their face, that they permit decisions on entry and exclusion of publications that are arbitrary, inconsistent, irrational and discriminatory, and that they preclude any possibility of a consistent and constitutional application. In the course of this discussion, I will address each guideline, as revised effective October 13, 1976, and offer my opinion as to its constitutionality.

However, before doing so, it is appropriate that I briefly summarize the progress and adjustments which the Department of Correctional Services has made in its literature review policy and procedures since the inception of this lawsuit in 1969.

In 1969 plaintiffs alleged that corrections officials had failed to establish and comply with any objective and valid procedures which would insure that constitutional limitations on censorship would not be exceeded. Today, corrections officials are guided by specific regulations and procedures, set forth in Administrative Bulletin No. 60, which govern the literature review process. These regulations provide for a media review committee within each institution as well as for a Departmental Media Review Committee in Albany to monitor and assist each correctional facility review committee. This Departmental Committee also provides master lists of approved literature to assure a degree of uniformity among the facility review committees' decisions.

The regulations contain notice requirements and time limitations which offer additional protections against arbitrary decisions to exclude contested publications. By structuring and raising the visibility of this decision-making process, corrections administrators help to minimize the adverse effects of discretionary decision-making. *See* K. Davis, *Discretionary Justice*, 188–189 (1969). The Department of Correctional Services is to be commended for regularizing its procedures and should be encouraged to continue scrutinizing and refining these procedures to assure that arbitrary and capricious action by the review committees is minimized in this sensitive area of first

amendment rights. *See, e. g., Cofone v. Manson,* 409 F.Supp. 1033 (D.Conn.1976).

In 1969 plaintiffs alleged that decisions to bar publications from correctional facilities were not guided by any objectively valid criteria. Today, under Administrative Bulletin No. 60, the Department of Correctional Services has provided each institution with specific guidelines for evaluating publications addressed to inmates. It is noteworthy that the Department has not promulgated a "catch-all" regulation, such as that condemned in *Cofone v. Manson, supra* at 1040–1041, which would allow the prisons to reject publications which "obstruct rehabilitative objectives." Such a regulation would clearly be impermissibly overbroad. *See, e. g., Procunier v. Martinez,* 416 U.S. 396, 415, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). While plaintiffs still claim that five of the eight guidelines are both vague and overbroad on their face, a concern which I will address below, the Department of Correctional Services has at least acted to structure its largely discretionary decision-making. *See* K. Davis, *Administrative Law Text* 91 *et seq.* (1972).

In 1969, works by Erik Erikson, Claude Lévi-Strauss, Carl Jung, Marshall McLuhan, Susanne Langer, and Oscar Lewis were allegedly being excluded from correctional facilities by administrators. Today there is no question that all of these works would pass uncontested into inmates' hands. Even publications considered controversial several years ago, including *The Autobiography of Malcolm X*, Eldridge Cleaver's *Soul on Ice*, H. Rap Brown's *Die Nigger Die!*, George Jackson's *Blood in My Eye*, and Hubert Selby's *The Room*, are now acceptable and apparently available to inmates. Today, a sampling, taken from a more recent transmittal sheet, of the publications which are being excluded shows that they tend to bear title such as *SMUT, Bawdy Brunettes, Corsets, Collars and Chains, Karate Illustrated*, and titles of a similar nature (*see* Review Decisions transmittal sheets of June 3 and June 17, 1975).

Whether or not it is appropriate for corrections officials to bar even these publica-

tions is another one of the issues addressed below. However, it does appear that corrections officials have made a qualitative leap forward and have come to acknowledge that no valid penological purpose is served by excluding not only works by Bruno Bettelheim, Norman O. Brown and Charles Silberman, but also those of Nikki Giovanni, Robert Beck ("Iceberg Slim"), Franz Fanon, Malcolm X, and H. Rap Brown.

By making such adjustments in policy and procedure over the years, largely at the prompting of plaintiffs and other inmate litigants, the Department of Correctional Services has acknowledged that inmates of New York's correctional facilities are not stripped of the mantle of their first amendment rights as they enter the prison gates. The evolution of the policies and procedures which govern media review decisions is itself an affirmation of the right of the incarcerated to receive and read a wide range of publications which can expand the imaginations and free the minds of men and women who have been removed from a free and open society and confined, at least temporarily, in a necessarily closed and tightly regulated one.

It has long been recognized that "[a] prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." *Coffin v. Reichard,* 143 F.2d 443, 445 (6th Cir. 1944), *cert. denied,* 325 U.S. 887, 65 S.Ct. 1568, 89 L.Ed. 2001 (1945). Courts of this and other circuits have held that various first amendment rights survive incarceration. *See Wolfish v. Levi,* 573 F.2d 118, 129 (2d Cir. 1978); *Morgan v. LaVallee,* 526 F.2d 221 (2d Cir. 1975); *Goodwin v. Oswald,* 462 F.2d 1237 (2d Cir. 1972); *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971), *cert. denied sub nom. Oswald v. Sostre,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972) (right to possess one's own writings); *Larkins v. Oswald,* 364 F.Supp. 1374 (W.D.N.Y. 1973), *aff'd* 510 F.2d 583 (2d Cir. 1975) (right to retain Black Panther Party documents in one's cell); *Burnham v. Oswald,* 342 F.Supp. 880 (W.D.N.Y.1972) (right to be

interviewed by news media representative); *Fortune Society v. McGinnis*, 319 F.Supp. 901 (S.D.N.Y.1970) (right to receive a newsletter published by former inmates and often critical of prison authorities); *Carothers v. Follette*, 314 F.Supp. 1014 (S.D.N.Y.1970) (right to send to one's family a letter critical of prison officials and administration). *See also Woods v. Daggett, supra* at n.3; *Aikens v. Jenkins*, 534 F.2d 751 (7th Cir. 1976); *Nolan v. Fitzpatrick*, 451 F.2d 545 (1st Cir. 1971) (right to send letters to news media); *Brown v. Peyton*, 437 F.2d 1228 (4th Cir. 1971) (right to receive religious literature); *Walker v. Blackwell*, 411 F.2d 23 (5th Cir. 1969) (right to receive religious literature); *Jackson v. Godwin*, 400 F.2d 529 (5th Cir. 1968) (right to receive black publications); *Taylor v. Perini*, 413 F.Supp. 189 (N.D.Ohio, 1976) (right to receive black publications); *Laaman v. Hancock*, 351 F.Supp. 1265 (D.N.H.1972) (right to receive newspapers and magazines); *Payne v. Whitmore*, 325 F.Supp. 1191 (N.D.Cal.1971) (right to receive newspapers and magazines).

More recently, the United States Supreme Court has acknowledged that "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974).

In this instance it is not only the interests of prison inmates which are at stake. The one who sends literature also has a fundamental interest in the inmate's access to the information in the published material. *Woods v. Daggett, supra* at 240. When corrections officials censor publications addressed to inmates, they also place a burden on freedom of the press. *Cofone v. Manson, supra* at 1039, *citing Grosjean v. American Press Company*, 297 U.S. 233, 248–50, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

The Second Circuit Court of Appeals has recognized that the first amendment right to receive information is a preferred freedom entitled to special solicitude:

In the close and restrictive atmosphere of a prison, first amendment guarantees taken for granted in society at large assume far greater significance. The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections, supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment. Accordingly, courts have jealously protected the inmate in his exercise of first amendment prerogatives.

*Wolfish v. Levi, supra* at 129. *See also Morgan v. LaVallee, supra* at 224; *Sostre v. McGinnis, supra* at 189, 199. Justice Thurgood Marshall has provided an eloquent commentary on the significance of first amendment rights for the incarcerated:

When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions; his yearning for self-respect does not end; nor is his quest for self-realization concluded. If anything, the needs for identity and self-respect are more compelling in the dehumanizing prison environment. Whether an O. Henry writing his short stories in a jail cell or a frightened young inmate writing his family, a prisoner needs a medium for self-expression.

*Procunier v. Martinez, supra,* 416 U.S. at 428, 94 S.Ct. at 1818, 40 L.Ed.2d at 245 (Marshall, J., concurring).

The evaluation of challenged publications by the media review committees should be guided by the presumption that literature should be freely available to prison inmates. *Laaman v. Hancock, supra* at 1268; *Sostre v. Otis, supra* at 946. Because of the preferred status of first amendment rights, correctional authorities who would be censors must show that their imposed restrictions are justified. *Burnham v. Oswald, supra* at 884–85. *See also, Aikens v. Jenkins, supra* at 755; *Wilkinson v. Skinner*, 462 F.2d 670, 671 (2d Cir. 1972); *Brown v. Peyton, supra* at 1231; *Sostre v. Otis,*

*supra* at 944. When a decision is made to censor a particular publication, the reviewing authorities must "strongly show some substantial and controlling interest which requires the subordination or limitation of these important constitutional rights, and which justifies their infringement." *Jackson v. Godwin, supra* at 541. *See also, Sobell v. Reed,* 327 F.Supp. 1294, 1303 (S.D. N.Y.1971). It is most important that corrections officials responsible for censorship be aware of this burden which the Constitution, and more particularly the first amendment, places upon them:

> It is only because of the unique situation which exists in a prison that they are empowered to reject publications at all. When the decision to reject a publication is made, it must be made on their professional judgment of the serious threat posed by the publication and not on their personal judgment concerning the merits of its contents.

*Cofone v. Manson, supra* at 1041 n.20.

■ These considerations must be tempered by the recognition that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356, 1369 (1948). Giving appropriate recognition to the peculiar and restrictive circumstances of penal confinement, I have often acknowledged in the past, and I reiterate here, that internal management of our prisons rests primarily in the hands of corrections personnel:

> The day-to-day task of fashioning rules for the guidance and control of inmates must be left to the correctional authorities.

*Burnham v. Oswald, supra* at 884. *See also Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Procunier v. Mar-*

*tinez, supra,* 416 U.S. at 405, 94 S.Ct. 1807.[4] The action before me provides a good example of the court's recognition of the prerogatives accorded corrections personnel. It is only after these personnel have had ample opportunity to scrutinize their own standards and procedures, and at the plaintiffs' urging to make certain modifications, that the standards now come before this court for final review and a declaratory judgment.

■ In appropriate circumstances, however, the federal courts do have a responsibility to protect the constitutional rights of state prison inmates. *See Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). The courts have not hesitated to act to assure that corrections officials are guided by proper constitutional standards. *See, e. g., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Wolfish v. Levi, supra.* Nor have courts been hesitant to scrutinize the procedures which guide decision-making to assure that they are consistent with due process requirements. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Haymes v. Regan,* 525 F.2d 540 (2d Cir. 1975); *Coralluzzo v. New York State Parole Board,* 420 F.Supp. 592 (W.D.N.Y. 1976), *aff'd,* 566 F.2d 375 (2d Cir. 1977), *cert. granted,* 434 U.S. 996, 98 S.Ct. 632, 54 L.Ed.2d 490 (1977), *appeal dismissed,* 435 U.S. 912, 98 S.Ct. 1464, 55 L.Ed.2d 503 (1978). It is therefore clear that where a violation of constitutional rights has been shown, courts have not only the power but also the duty to intervene in internal affairs of a prison. *See Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Sostre v. McGinnis, supra; Gittlemacker v. Prasse,* 428 F.2d 1 (3d Cir. 1970).

■ A great deal of discretion has been vested in prison authorities to decide which publications shall pass through the prison

---

4. The court has no desire to become unnecessarily embroiled in the "increasingly urgent problems of prison administration and reform." *Procunier v. Martinez, supra* 416 U.S. at 405, 94 S.Ct. at 1807. Once it has been assured that constitutional standards have been established, are being applied, and that due process requirements are being honored, the court can then withdraw as mediator between corrections officials and inmates.

gates. While these reviewers may be well versed in the realities of prison life, some may not be so well attuned to the subleties of the first amendment. *See* Defendants' Exhibits No. 4 through No. 10 (resumés of members of Departmental Media Review Committee). Therefore, it is appropriate that I review and closely scrutinize the claims of these plaintiffs which involve the alleged deprivation of fundamental and preferred freedoms guaranteed under the first amendment. *See Brown v. Peyton, supra; Jackson v. Godwin, supra; Fortune Society v. McGinnis, supra.*

In *Procunier v. Martinez*, the Supreme Court established a general framework for analysis of the first amendment issues presented in this case. The Court held that inmates' mail may be censored if the following criteria are met:

> *First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.* Prison

officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order and rehabilitation. *Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.* Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

416 U.S. at 413–414, 94 S.Ct. at 1811, 40 L.Ed.2d at 240 (emphasis added).[5] These would appear to be the minimal standards with which prison administrators must comply in order to censor incoming publications.[6] As the Second Circuit has recognized, this test reiterates the requirements

---

**5.** Even before the Supreme Court established these tests in *Procunier v. Martinez*, district courts of this circuit had applied the essentially identical test that any prison regulation which restricts a prisoner's first amendment rights must be related both reasonably and necessarily to the advancement of some justifiable purpose of imprisonment, including the rehabilitation of the prisoner or the maintenance of security and discipline within the institution. *See Burnham v. Oswald, supra* at 885; *Sobell v. Reed, supra* at 1303; *Carothers v. Follette*, 314 F.Supp. 1014, 1024 (S.D.N.Y.1970). *See also, Morgan v. LaVallee, supra* at 224; *The Luparar v. Stoneman*, 382 F.Supp. 495 (D.Vt.1974), *appeal dismissed*, 517 F.2d 1395 (2d Cir. 1975). In *Fortune Society v. McGinnis, supra* at 904 the court recognized that:

> Only a compelling state interest centering about prison security, or a clear and present danger of a breach of prison discipline, or some substantial interference with orderly institutional administration can justify curtailment of a prisoner's constitutional rights.

**6.** The Court's decision in *Procunier v. Martinez* was not based on a consideration of the extent to which an individual's first amendment rights survive incarceration. 416 U.S. at 408, 94 S.Ct. 1800.

The standards which the Court established applied to direct personal correspondence between inmates and individuals outside of the correctional facility. The majority opinion noted that "[d]ifferent considerations may come

into play in the case of mass mailings. No such issue is raised on these facts, and we intimate no view as to its proper resolution." *Procunier v. Martinez, supra* 416 U.S. at 408 n.11, 94 S.Ct. at 1809. Despite this disclaimer, most courts which have since ruled on literature-review standards have been guided by the criteria of *Procunier v. Martinez. See, e. g., Blue v. Hogan*, 553 F.2d 960 (5th Cir. 1977); *Aikens v. Jenkins, supra; Morgan v. LaVallee, supra; Taylor v. Perini, supra; Hopkins v. Collins*, 411 F.Supp. 831 (D.Md.1976), *modified*, 548 F.2d 503 (4th Cir. 1977); *Cofone v. Manson, supra; The Luparar v. Stoneman, supra; Gray v. Creamer*, 376 F.Supp. 675 (W.D.Pa. 1974).

I concur with the distinction which Judge Blumenfeld of the District of Connecticut has drawn between personal correspondence and general publications:

> [T]he nature of the material being censored, impersonal publications of general circulation, open to inspection and even subscription by the prison administration, necessarily poses much less of a security risk to the institution than does regular mail, in closed envelopes, intended to communicate a particular, personal message from the sender to the addressee.

*Cofone v. Manson, supra* at 1039. *But cf. Blue v. Hogan, supra* at 962–963 n.4 ("Arguably prison officials may have more latitude in censoring periodicals.")

established in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968),[7] and applies those standards to cases involving censorship of prisoners' materials. *Morgan v. LaVallee, supra* at 224–225.

■ I read these standards to require a substantial factual showing by corrections officials that a publication poses a tangible threat to the order, security, or rehabilitative programs of the prison before they may bar the publication from the facility. *See Morgan v. LaVallee, supra* at 224; *The Luparar v. Stoneman,* 382 F.Supp. 495, 499 (D.Vt.1974); *Cooper v. Morin,* 91 Misc.2d 302, 398 N.Y.S.2d 36, 59 (Sup.Ct. Monroe Co. 1977). The *O'Brien-Procunier* test, as adopted by the Second Circuit, when employed to aid in balancing the interests of the state and of the prisoners, would permit inhibition of first amendment rights *only to the extent absolutely necessary.* It would protect inmates from restrictions that are not essential for the security and integrity of the incarceration process. *See Comment,* 70 Nw.U.L.Rev. 352, 367–368 (1975). This test enables the state to protect its substantial interest in preventing escapes, riots, and general violence within its prisons while guarding against the unnecessary infringement of inmates' first amendment rights by the media review committees.[8]

That at least some discretion to censor certain publications must be accorded prison authorities is not contested, since plaintiffs do not challenge Guidelines No. 1, No. 7, and No. 8, the latter two of which could be· used to bar publications that would otherwise be available to the general public. The question thus becomes whether or not the remaining guidelines are within the constitutional limits that are established by the *O'Brien-Procunier* test.

## GUIDELINE NO. 2

■ Guideline No. 2 reads:

In general, publications which appeal to prurient interests or which are utterly without redeeming social value, or which clearly depict acts involving necrophilia, masochism, sadism, bestiality, or unnatu-

---

**7.** In the Supreme Court's words:

[W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien, supra* 391 U.S. 367 at 377, 88 S.Ct. 1673 at 1679, 20 L.Ed.2d 672 at 680 (1968).

**8.** Plaintiffs urge the court to adopt a test which would require corrections officials to demonstrate that a publication poses a "clear and present danger" before it may be censored. Some courts have articulated such a test. *See, e. g., Wilkinson v. Skinner, supra* at 672–73; *Long v. Parker,* 390 F.2d 816, 822 (3d Cir. 1968); *Taylor v. Perini, supra; Seale v. Manson,* 326 F.Supp. 1375, 1382 (D.Conn.1971); *Fortune Society v. McGinnis, supra* at 904. Other courts have rejected it. *See, e. g., Blue v. Hogan, supra* at 962; *Hardwick v. Ault,* 447 F.Supp. 116 (M.D.Ga.1978). While the Supreme Court has not specifically found. the "clear and present danger" test to be applicable to writings which pose a threat to security and order within a penal institution, it has approved regulations which incorporated such a standard. *See Procunier v. Martinez, supra* 416

U.S. at 416–418 n.15, 94 S.Ct. at 1812, 40 L.Ed.2d 241.

The Supreme Court has apparently adopted the definition of the phrase "clear and present danger" offered by Judge Learned Hand:

In each case [courts] must ask whether the. gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger. *Dennis v. United States,* 341 U.S. 494, 510, 71 S.Ct. 857, 868, 95 L.Ed. 1137 (1951). (citation omitted). More recently the Supreme Court has recognized that

the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing *imminent lawless action and is likely to incite or produce such action.*

*Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (emphasis added). *See also, Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (incitement-to-violence test).

While the language of these cases is instructive, I hesitate to formulate the test in terms of "clear and present danger" because the multitude of meanings which has come to attach to that language may hinder rather than facilitate the review process.

ral preoccupation with excrement, are not acceptable. Otherwise, literature dealing with the subject of sex is to be considered appropriate.

This guideline incorporates the "utterly without redeeming social value" standard which comprised one part of the three-pronged test applied by the Supreme Court in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966).[9] This test has since been revised by the Court in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).[10] The theme running throughout the majority opinion in *Miller* is that only "hard-core" pornography is meant to be banned. *Miller v. California, supra* 413 U.S. at 27, 93 S.Ct. at 2616.

It is apparent that Guideline No. 2 fails to comply with the most recently established judicial standards defining obscenity. The disjunctive nature of Guideline No. 2 renders it unconstitutionally overbroad. Under the Supreme Court's holding in *Miller v. California*, the mere depiction of patently offensive sexual acts is not enough to support censorship of the material. There is the conjunctive requirement that the material must be shown to be lacking any serious literary, artistic, political, or scientific value.

Under Guideline No. 2, the criteria which would bar material which clearly depicts acts involving necrophilia, masochism, sadism, bestiality, or unnatural preoccupation with excrement is too broad. Applying

these criteria alone could result in publications such as the following being banned from New York's penal institutions: John Barth's *Floating Opera* and *The Sotweed Factor*, William Golding's *Lord of the Flies*, John Hawkes' *Travesty*, Edgar Allen Poe's short story *Ligeia*, William Faulkner's short story *A Rose for Emily*, and *The Decameron* of Giovanni Boccaccio, as well as some of the novels of Jean Genet, Norman Mailer, and William S. Burroughs. All of these works contain isolated instances of the acts which would render the entire work unacceptable under Guideline No. 2, yet it is clear that none of these works can be classified as "judicially defined obscenity." I have also reviewed *The Room* by Hubert Selby, Jr., and *The Pearl*, which were originally excluded under Guideline No. 2 but which are now acceptable, and I find that neither one of these volumes can be classified as obscene.

Despite defendants' professed belief that certain sexually oriented material might incite prison inmates, the record is devoid of any proof that would support a finding of any discernible link between literature and sex abuse among inmates.[11] Defendants have specifically disclaimed any concern that sexually oriented material, of whatever nature, will "corrupt" inmates. *See* Defendants' Brief at 22. Thus the concern is not that rehabilitation efforts will be adversely affected.

**9.** The test of obscenity established in *Roth v. United States*, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957), was "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." In *Memoirs v. Massachusetts*, the Court reiterated the *Roth* standard and added that three elements must coalesce for a publication to be held to be obscene:

> [I]t must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is supra, utterly without redeeming social value.

*Supra*, 383 U.S. at 418, 86 S.Ct. at 977.

**10.** In *Miller v. California, supra*, the Court held that material could be considered to be obscene if the trier of fact found that (a) "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; and (c) the work, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Miller v. California, supra* 413 U.S. at 24, 93 S.Ct. at 2615. This definition of obscenity has been incorporated into New York Penal Law § 235.-00.

**11.** *See generally* Note, 7 Capital U.L.Rev. 317, 323 n.37 (1977).

George Bohlinger, who was superintendent of the Massachusetts Correctional Institution in Norfolk, Massachusetts, at the time he testified in 1972, stated that hardcore pornography was the only material of a sexual nature that was excluded from his institution. Trial Transcript [hereinafter referred to as "T.T."] at 20. He testified that in his experience, he had not observed any harmful effect on the peace and good order of his institution from following such a policy. T.T. at 26.

Robert Montilla testified on plaintiffs' behalf that during his tenure from 1969–1971 as the Deputy Director of the Department of Corrections in Washington, D.C., the only material of a sexual nature that was banned from the institution under his supervision was "the extreme of pornography where it was photographically or pictorially portrayed, sex acts involving contact of the genitalia." T.T. at 265. Mr. Montilla testified that:

> [W]e could never find any relationship between that material being available and any adverse consequences. The fact is I think there is more evidence to the contrary, as long as the people are reading and talking and writing about such matters they are less inclined toward the more extreme frustration of acting out in these areas.

T.T. at 266.

Professor Thomas Murton, formerly the Commissioner of the Arkansas Prison System, offered the following testimony when asked his opinion of Guideline No. 2:

> Mr. Murton: Every author dreams of having his publication banned. The best way to lend credence to a deviant philosophy is to attempt to exterminate it because it is the forbidden fruit

which becomes exotic, so I would not want to, even if I disagreed with it personally, I would not want to inadvertantly [sic] enhance its desirability by excluding it.

> Mr. Schwartz: In other words, you think that might have a negative effect on rehabilitation?

> Mr. Murton: The process might. Not the book itself.

T.T. at 56.

This testimony would seem to indicate that inmate freedom to receive and read sexually oriented material that is not judicially proscribed because obscene advances rather than retards the goal of rehabilitation.

A number of courts have upheld regulations permitting censorship of "judicially defined obscenity." *See, e. g., Procunier v. Martinez, supra*, 416 U.S. at 416 n.15, 94 S.Ct. at 1812; *Taylor v. Perini, supra; Gray v. Creamer, supra*, note 6; *McCleary v. Kelly*, 376 F.Supp. 1186 (M.D.Pa.1974). *See also Aikens v. Jenkins, supra; Craig v. Hocker*, 405 F.Supp. 656, 674 (D.Nev.1975).[12] *But cf. Carpenter v. State of South Dakota*, 536 F.2d 759 (8th Cir. 1976), *cert. denied*, 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977); *Frazier v. Donelon*, 381 F.Supp. 911 (E.D.La.1974), *aff'd* 520 F.2d 941 (5th Cir. 1975), *cert. denied* 424 U.S. 923, 96 S.Ct. 1134, 47 L.Ed.2d 332 (1976).

I believe that the "judicially defined obscenity" standard should apply. In order to be constitutionally acceptable, a regulation may permit suppression of sexually oriented material only if the material comports with a standard of obscenity defined by the courts and the Legislature rather than one articulated by prison authorities.[13]

---

**12.** As the Supreme Court has recognized:
> While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction.

*Procunier v. Martinez, supra*, 416 U.S. at 414 n.14, 94 S.Ct. at 1812.

**13.** Shortly before this decision was filed, defendants supplied the court with a copy of a memorandum dated April 22, 1976, from Lewis L. Douglass, Executive Deputy Commissioner of the Department of Correctional Services, to the Central Office Media Review Committee and the facility media review committees. The memorandum offers clarification of the present guidelines with respect to obscene literature. It is reproduced in its entirety following Administrative Bulletin No. 60 in the appendix to this decision.

GUIDELINE NO. 3

■ As revised, Guideline No. 3 now provides that:

The publication should not incite violence based on race, religion, creed or nationality.

This language represents a considerable improvement over the language of the regulation which it superseded.[14] In its previous form, Guideline No. 3 "fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship." *Procunier v. Martinez, supra*, 416 U.S. at 415, 94 S.Ct. at 1812. However, as revised, Guideline No. 3 is drawn narrowly "to reach only material that might be thought to encourage violence" (*Id.* at 416, 94 S.Ct. at 1813), and is sufficiently specific in defining proscribed literature that it now satisfies the *O'Brien-Procunier* test. *See also Hopkins v. Collins, supra* 411 F.Supp. at 834.

GUIDELINES NO. 4 and NO. 5

■ Because of their similarity, Guidelines No. 4 and No. 5 will be treated together. Guideline No. 4 provides:

The publication should not advocate the violent overthrow of the existing form of government of the United States or of this State. (See Penal Law § 240.15).

Plaintiffs have not alleged that any materials were specifically excluded under this guideline.

Guideline No. 5 is a more broadly written guideline which, in fact, encompasses the provisions of Guideline No. 4. It reads:

14. Before the most current revision, Guideline No. 3 read:

The publication should not defame, villify or incite hatred towards persons because of their race, religion, creed or national origin.

15. Penal Law § 240.15 provides that:

A person is guilty of criminal anarchy when (a) he advocates the overthrow of the existing form of government of this state by violence, or (b) with knowledge of its contents, he publishes, sells or distributes any document which advocates such violent overthrow, or (c) with knowledge of its purpose, he becomes a member of any organization which advocates such violent overthrow.

The publication should not advocate lawlessness, violence, anarchy or rebellion against governmental authority or portray such conduct as a commendable activity.

Plaintiffs allege that this is the principal guideline relied on by corrections officials to exclude revolutionary literature. *Blood in My Eye, Die Nigger, Die*, and *The Black Panthers Speak* were originally banned under this guideline, but are now admissible and have apparently been determined not to pose a threat to the penal institutions any longer.

In *People v. Epton*, 19 N.Y.2d 496, 281 N.Y.S.2d 9 (1967), the New York State Court of Appeals held that, in order to preserve the constitutionality of Penal Law § 240.15,[15] New York's criminal anarchy statute, certain "sound constitutional requirements" must be read into the statute:

It is clear that the proscription of mere advocacy of the violent overthrow of the Government would be an unconstitutional infringement upon free speech [*Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)]. The advocacy of the overthrow of the Government by force and violence must be accompanied by an intent to accomplish the overthrow (*Dennis v. United States, supra; Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629) and there must be a "clear and present danger" that the advocated overthrow may be attempted or accomplished (*Dennis v. United States, supra*).

*People v. Epton, supra*, 19 N.Y.2d at 506, 281 N.Y.S.2d at 17.[16] Edward Elwin, who

16. In *Samuels v. Mackell*, 288 F.Supp. 348 (S.D.N.Y.1968), Judge Friendly concluded that P.L. § 240.15, read in light of *People v. Epton*, was not constitutionally defective. However, the Supreme Court then ruled that the lower court erred in proceeding to a consideration of the merits of New York's criminal anarchy law. The Supreme Court did, however, affirm the result of Judge Friendly's decision under the authority of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *Samuels v. Mackell*, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

was then the Deputy Commissioner of Corrections in charge of programs, testified for defendants that Guidelines No. 4 and No. 5 have been read by members of the media review committees "within the framework of some kind of violent change to be done immediately." T.T. at 81. However, no such restriction is *written* into Guidelines No. 4 and No. 5. Defendants produced neither internal departmental memoranda nor the testimony of any actual members of the media review committees which would support Deputy Commissioner Elwin's interpretation of Guidelines No. 4 and No. 5. It can be expected that courts of New York State will interpret and apply Penal Law § 240.15 under *People v. Epton* so as to save the statute's constitutionality. However, no such presumption attaches to the actions of the members of the media review committees.

It is significant that despite the stated fears of prison administrators, there is not a single reference in any of the testimony offered here that any article, periodical, book or other writing was ever responsible, either directly or indirectly, for inciting violence in any penal institution in this or any other state. *See, e. g., Northern v. Nelson,* 315 F.Supp. 687 (N.D.Cal.1970), *aff'd* 448 F.2d 1266 (9th Cir. 1971). Samuel Moreno, who was Director of Education for the Department of Correctional Services and who was also Chairman of the Departmental Media Review Committee at the time, testified by deposition taken August 7, 1972 that he was not aware of any research or studies which showed the effect of various kinds of literature on inmate behavior. Deposition of Samuel Moreno at 38. Plaintiffs' corrections experts, Messrs. Bohlinger, Murton, and Montilla, testified uniformly that they had never heard of or observed any situation or incident where a publication led to violence among inmates. *See, e. g.,* testimony of Robert Montilla at 302 of Trial Transcript. Mr. Montilla did acknowledge that certain extremist literature could conceivably exacerbate tensions which may already exist between extremist groups within an institution. T.T. at 301.

Material that may reasonably be thought to incite violence or disruption within a correctional facility may be prohibited by a narrowly drawn regulation. *See, e. g., Aikens v. Jenkins, supra; Hopkins v. Collins, supra.* However, Guideline No. 5 is so broadly written that it can be read to support the exclusion of such material as the Declaration of Independence, the writings of Tom Paine, Martin Luther King, Mohandas K. Ghandi, Henry David Thoreau, Michael Bakunin, Thomas Jefferson, and William O. Douglas, among others.

I agree with Judge Blumenfeld in holding that "in order to be within the reach of a constitutional ban concerning proposed activity *outside* the institution, the publication must present a clear and present danger of the occurrence of the criminal activity" which is advocated in the publication. *Cofone v. Manson, supra* at 1040.[17]

## GUIDELINE NO. 6

Guideline No. 6 provides:

> The publication should not incite disobedience toward law enforcement officers or prison personnel.

The plaintiffs have not alleged that any publications were specifically excluded under this guideline.

I believe that this regulation is drawn in a sufficiently narrow fashion to survive plaintiffs' constitutional attack. *See Hopkins v. Collins, supra* at 834. However, it is important that the language of this regulation be applied literally by corrections officials. Literature that criticizes police or corrections officials cannot be excluded under this guideline. There must be a substantial showing by the media review committee members that the publication does indeed pose a tangible threat to the order and security of the institution for such publication to be banned under this guideline.

---

17. *But cf. McCleary v. Kelly, supra; Gray v. Creamer, supra* (approving regulation which would allow censorship of "[c]learly inflammatory writings advocating violence, insurrection or guerilla warfare against the government or any of its institutions").

The language of Guidelines No. 3 and No. 6 and the interpretations of Guidelines No. 4 and No. 5, as testified to by Deputy Commissioner Elwin, indicate that corrections officials have adopted a test equivalent to the "clear and present danger" test which is urged by the plaintiffs to guide the decision-making of the media review committees. As the Supreme Court has indicated:

> This does not mean, of course, that prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty.

*Procunier v. Martinez, supra* 416 U.S. at 414, 94 S.Ct. at 1811. Certainly, it is to be expected that the guidelines could be read to require more stringent controls when an institution faces actual or threatened disruption. However, it is equally important for corrections officials to provide for the lifting of any such more stringent interpretation and application of the guidelines as soon as possible after the institution has returned to normalcy.[18] Whatever the context, members of the media review committees must be guided by the dual requirements of *O'Brien-Procunier* that their decisions further an important or substantial governmental interest unrelated to the suppression of free expression and that any decisions authorizing censorship of publications must be no more restrictive than is essential to protect the particular governmental interest involved.

I have reviewed each of the contested publications. I do not believe that any of the contested publications, including all of those listed in Appendix B of Plaintiffs' Amended Complaint filed February 14, 1973, actually poses such a tangible threat to the order, security or rehabilitative programs of New York's correctional facilities to warrant exclusion under properly drawn guidelines.

According to the testimony of Samuel Moreno, the Department's policy is to exclude an entire publication even though only a very small portion of the publication, as little as a single page, may be deemed objectionable under the Guidelines. *See* Moreno Deposition at 20. If this continues to be the practice which the media review committees follow,[19] it does not appear to conform to the mandate of *Procunier v. Martinez* that censorship be no greater than is essential to protect a valid penological interest. This all-or-nothing approach deserves reconsideration and modification under the Department's practice of ongoing review and revision of existing policy.

The procedures that guide review of literature addressed to inmates are no longer at issue in this lawsuit. However, since both plaintiffs and defendants address the procedures in their memoranda of law, it is appropriate that I comment briefly on one aspect of the procedure that appears to be deficient. The most recent information

---

18. The testimony of at least one corrections official indicates that this apparently is the Department's policy:

> [W]e are very careful about certain periods of time, when incidents are taking place in certain localities. In other words, when we have State Troopers on the wall of Great Meadow, almost anything that sneezes we keep out. But as soon as those troopers go away and those inmates get up and start walking around in the normal or every day routine, almost everything would go in. The situation and the particular institution influences our decision.

Deposition testimony of Samuel Moreno, Director of Education Department and Chairman of Departmental Media Review Committee, N.Y.S. Department of Correctional Services, at 44, 45 (August 7, 1972).

> It does not appear, however, that this logic and rationale are explicitly incorporated into the Guidelines.

19. Administrative Bulletin No. 60 does provide that:

> Once a publication (book, magazine, periodical) has been included on the *Master List* [a list of publications which prior review has demonstrated do not usually violate the Guidelines] by the Departmental Committee, no single issue should be disapproved because of an occasional feature or article which may contradict the established guidelines.

available to the court indicates that when an inmate is notified that a publication has been rejected, he is merely advised of the number of the Guideline which the publication violates. Other courts have recognized that it is insufficient for the rejection notice to recite only the applicable criteria or guideline. *See, e. g., Cofone v. Manson, supra* at 1041 n.21. It would be the better practice for the rejection notice to contain a brief statement of the reasons, in meaningful language, for rejection of the publication, specifying the offending portion if less than the entire publication is objectionable. A reasons requirement promotes thought by the decision-maker, focuses attention on the relevant points and further protects against arbitrary and capricious decisions grounded upon impermissible or erroneous considerations. *Zurak v. Regan*, 550 F.2d 86, 95 (2d Cir. 1977), *cert. denied* 433 U.S. 914, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977); *United States ex rel. Johnson v. Chairman*, 500 F.2d 925, 931 (2d Cir.), *vacated sub nom. Regan v. Johnson*, 419 U.S. 1015, 95 S.Ct. 488, 42 L.Ed.2d 289 (1974).

## CONCLUSION

In conclusion, Guidelines No. 2, No. 4, and No. 5, as set forth in Administrative Bulletin No. 60, are declared to violate plaintiffs' rights under the first amendment because they are unconstitutionally vague and overbroad. Guidelines No. 3 and No. 6 are drafted in a sufficiently narrow fashion to satisfy the *O'Brien-Procunier* test. All of the contested publications should be admitted to New York State's correctional facilities.

So ordered.

## APPENDIX

### STATE OF NEW YORK

### DEPARTMENT OF CORRECTIONAL SERVICES

GOV. A. E. SMITH
STATE OFFICE BUILDING
P. O. BOX 7033
ALBANY, N.Y. 12225

RUSSELL G. OSWALD
COMMISSIONER

May 30, 1972

ADMINISTRATIVE BULLETIN #60

TO: Superintendents of Correctional Facilities and State Institutions, Directors of State Hospitals, Central Office Group Heads and Division Heads, and Directors and Supervisors of Parole Field and Institutional Offices.

FROM: Russell G. Oswald, Commissioner /s/ Russell G. Oswald

RE: Guidelines and Procedures Governing the Receipt and Review of Literature and Related Materials for Inmates.

_____

In accordance with Department practice of ongoing review and revision of existing policy, Administrative Bulletin # 2 Amended is hereby canceled. Consequently, instructions contained herein supersede the following Departmental Directives:

1. Administrative Memo # 81, issued March 24, 1971;

2. Administrative Bulletin # 2, issued April 29, 1971;

3. Procedural Supplement to Administrative Bulletin # 2;

4. Administrative Bulletin # 2 Amended, issued 9/7/71.

The following policy and procedures now apply on this subject.

Departmental policy is to allow access by inmates to literature and related materials for either program or private individual use. Accordingly, inmates shall be allowed to subscribe to or receive from authorized correspondents a wide range of books, magazines and newspapers. As many inmates are undereducated and lack avocational interests, their reading of worthwhile materials is to be encouraged and guided. The understanding of the content of a wide range of subject matter may contribute to the development of a more knowledgeable and responsible human being with increased capacity to understand and adjust to society.

There are, however, some inmates whose emotional instability and anti-social attitudes are such that access to certain material may lead to individual behavior or behavior by groups of inmates which threatens the safety and security of the institution for both staff and other inmates, and which deters the operation of a therapeutic program. In such cases some censorship or prior restraint of inflammatory, obscene or disruptive literature is necessary to deter unrest, violence, and maladjustment.

In order that Department employees might be instructed concerning the proper review of literature for inmates, the Department specifies the following guidelines by which literature for inmates will be evaluated:

1. In general, the materials should be acceptable for regular mailing in the United States.

2. In general, publications which appeal to prurient interests or which are utterly without redeeming social value, or which clearly depict acts involving necrophilia, masochism, sadism, bestiality, or unnatural preoccupation with excrement, are not acceptable. Otherwise, literature dealing with the subject of sex is to be considered appropriate.

3. The publication should not incite violence based on race, religion, creed or nationality.

4. The publication should not advocate the violent overthrow of the existing form of government of the United States or of this State. (See Penal Law § 240.15).

5. The publication should not advocate lawlessness, violence, anarchy or rebellion against governmental authority or portray such conduct as a commendable activity.

6. The publication should not incite disobedience towards law enforcement officers or prison personnel.

7. The publication should not depict the use or manufacture of firearms, explosives and other weapons.

8. The publication should not be of such a nature as to depict, describe or teach methods and procedures for the acquisition of certain physical manipulations and skills which expertise will, in the opinion of Department authorities, constitute a threat to the safety, welfare and health of other inmates and employees.

Publications which discuss different political philosophies, and those dealing with criticism of Governmental and Departmental authority, are acceptable as reading material provided they do not violate the above guidelines.

The foregoing guidelines have been broadened and simplified for the purpose of facilitating easier access by inmates to a wide range of literature.

Superintendents and staff of Correctional Facilities are urged to use whatever available means they have to provide facility libraries with literature which presents differing points of view relevant to the issues of the day. This latter point is important in view of the highly biased and slanted nature of the literature which inmates are currently requesting.

In view of the above considerations, the department specifies the following procedures for evaluation and decision-making regarding literature for inmates.

## CORRECTIONAL FACILITY MEDIA REVIEW COMMITTEE

Each institution will establish a *media review committee.* It is suggested that this committee consist of the head of the service unit or his representative, a member of the Mental Hygiene staff, the chaplains, head of the education program or his representative, the librarian, and a representative of the custodial service.

The Superintendent will inform the Commissioner of the membership of the Facility Review Committee, by notifying the Chairman of the Departmental Media Review Committee. The Superintendent will also inform the Commissioner of any changes in said membership.

When it is determined that literature addressed or belonging to an inmate should be reviewed in order to ascertain its acceptability according to the guidelines of this bulletin, the facility review committee will meet to review the literature in question, and will be guided by the following:

1. The entire media review procedure must be exercised within a period of time not to exceed six weeks from the date the literature is received into the facility. That is to say the entire review process, from facility to Albany, to facility, must be complete before expiration of said six weeks period.

2. Initially, inmates will be advised in writing of such review so that they will be informed of the reason for delay in the receipt of their literature. Inmates may be invited to submit a written statement to the facility committee in explanation of their desire for the literature.

3. The facility committee will consider the inmate's literature, written statement and other pertinent information. Subsequently, the committee will issue a decision which shall be subject to approval by the Superintendent.

4. *Acceptable literature* will be given promptly to the inmates.

5. If the facility committee rejects the literature and the Superintendent upholds such decision, said literature will be forwarded to the Departmental Media Review Committee, with the *inmate's statement* and the Departmental Media Review Transmittal Report justifying said rejection. *Specific page numbers* which demonstrate a violation must be cited.

6. Inmates will not be prohibited from subscribing to newspapers, magazines and periodicals, but shall be informed that individual issues will be withheld if information contained therein is confirmed to be in violation of the guidelines set forth in this Bulletin. Articles will not be cut out or otherwise removed from any publication.

7. If, after being advised of these conditions, inmates wish to subscribe to newspapers, magazines and periodicals they will be allowed to do so. No facility will place a permanent ban on any publication unless instructed to do so by the Commissioner, or other appropriate authority as the Commissioner may designate.

8. Newspapers shall be delivered to inmates only when received direct from the publisher. Otherwise, inmates may receive *magazines, periodicals, journals,* etc. and *books* from sources other than the publisher after such publications have been examined and approved in accordance with instructions contained herein.

## DEPARTMENTAL MEDIA REVIEW COMMITTEE

The Departmental Media Review Committee is hereby established to assist and guide each Correctional Facility Review Committee in reviewing literature for inmates.

The Commissioner designates the Deputy Commissioner of Program Services to exercise administrative responsibility over the Department's Media Review Program. It shall be under his direction that procedures are administered, and memos and lists issued by the DMRC shall bear his signature.

The following Central Office Staff shall constitute official membership of the Departmental Review Committee:

1. Director of Education—Chairman
2. Director of Institutional Parole Services—Member
3. Director of Correctional Guidance—Member

An alternate member and staff assistants will be nominated as needed by the Chairman, and approved by the Deputy Commissioner of Program Services. Attorneys for the Department shall provide legal counsel as needed.

## NOTIFICATION OF APPROVED AND DISAPPROVED LITERATURE

Each Correctional Facility under the jurisdiction of the Department will be sent a written notification of the Departmental Media Review Committee (DMRC) determinations. These notifications will be used by each facility committee to modify and update their own lists of approved and disapproved literature which will be posted in areas readily accessible to inmates, (i. e., cell blocks, library, school bulletin boards).

## MASTER LISTINGS OF APPROVED LITERATURE

Periodically, the DMRC will send to each facility a master list of publications which prior review has demonstrated do not usually violate our literature guidelines. Such lists shall constitute the *Periodic Master List of Approved Literature, Department of Correctional Services.* Once a publication (book, magazine, periodical) has been included on the *Master List* by the Departmental Committee, no single issue should be disapproved because of an occasional feature or article which may contradict the established guidelines.

This *Master List* is not to be confused with the lists of approved and disapproved literature put forth by the DMRC regarding media referred to it by the Facility Committee; such review is concerned with single issues of periodicals and magazines, and not entire publications.

## DISSEMINATION OF INFORMATION CONTAINED HEREIN

Superintendents will provide a means whereby all inmates, employees and members of the Facility Media Review Committee are informed about this Bulletin. Inmates shall be informed of the procedure used by the Department to determine the acceptability of their literature, as well as the guidelines used by the Department to determine such acceptability.

## PERIODIC REVIEW

Whenever a publication has been disapproved by the Departmental Media Review Committee (DMRC), another review of the publication shall be conducted by the Departmental Media Review Committee (DMRC) when an inmate request to receive such publication is made more than eighteen months subsequent to the previous disapproval. Nothing contained herein shall prevent review of such publications by the Facility Media Review Committee (FMRC) or Departmental Media Review Committee (DMRC) prior to eighteen months after disapproval, where conditions warrant.

STATE OF NEW YORK—DEPARTMENT OF CORRECTIONAL SERVICES

MEMORANDUM

TO:     Central Office Media Review Committee          DATE:    April 22, 1976
        Facility Media Review Committees

FROM:   Lewis L. Douglass, Executive Deputy Commissioner

SUBJECT: Obscene Literature

I have been advised by the Office of Counsel that our present guidelines relative to obscene literature is in need of clarification. Although the current state of the law is

somewhat nebulous, I have been advised that it is safe to say that certain literature cannot be justifiably denied in the institutions.

In the future when considering the acceptability of magazines or literature which may or may not be obscene, one should be careful not to reject literature which is in the nature of literature which is readily available at newsstands or other dispensaries of literature. For example, magazines such as Playboy, Playgirl, Oui, Viva, Penthouse could not generally be considered obscene under the state of the law as it is today. Only in specific instances where overriding factors might be present should these magazines be rejected. Similar tests should be applied when considering books which tend to border on obscenity. Once again, if this literature or similar literature can be obtained at a newsstand, then careful consideration should be given before it is rejected.

/s/  Louis L. Douglass

LLD/PJF/kt